Ponchai WILKERSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 71309.

Court of Criminal Appeals of Texas, En Banc.

March 23, 1994.

Rehearing Denied June 8, 1994.

Connie B. Williams and Donald Davis, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Mary Lou Keel, Roberto Gutierrez, and Joe Owmby, Asst. Dist. Attys., Houston, and Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CAMPBELL, Judge.

At a trial held in the 184th District Court of Harris County in July 1990, a jury found appellant, Ponchai Wilkerson, guilty of capital murder.[1] At the punishment phase of appellant's trial, the jury answered affirmatively the punishment issues submitted to them under Article 37.071(b) of the Texas Code of Criminal Procedure, and appellant was sentenced to death as required by Article 37.071(e).[2] Direct appeal to this Court was then automatic under Article 37.071(h). We now affirm.

In sixteen points of error, appellant challenges: the sufficiency of the evidence to prove beyond a reasonable doubt that he intentionally caused the death of the deceased; the sufficiency of the evidence to support the jury's affirmative answer to the punishment issue concerning future dangerousness; the trial court's refusal to grant a mistrial after certain evidence of uncharged misconduct was admitted during the punishment phase; the trial court's refusal to grant a mistrial after the jury foreman revealed she was acquainted with a prosecution witness; and the trial court's refusal to grant a mistrial based on the prosecutor's final argument during the punishment phase.

■ In his first point of error, appellant argues that he has been denied his federal right to due process of law because the evidence at his trial was insufficient to support the jury's implicit finding that he *intentionally* caused the death of his victim. See footnote one, *supra.* Appellant notes that he testified at trial that he shot but did not intend to kill his victim, and argues that that testimony, like the testimony of the defendant in *Foster v. State,* 639 S.W.2d 691 (Tex. Crim.App.1982), was "sufficient to rebut the presumption of intent to kill based on his using a gun." The State argues in response that the jury was free to disbelieve appellant's trial testimony and to infer from the

---

1. Texas Penal Code § 19.03(a)(2), the statutory provision under which appellant was convicted, provides in relevant part that "[a] person commits a [capital] offense if he commits murder [by intentionally causing the death of an individual] and the person intentionally commits the murder in the course of committing or attempting to commit ... robbery[.]" Thus, the elements of the capital offense committed by appellant were: (1) a person (2) intentionally (3) causes the death (4) of an individual (5) while in the course of committing or attempting to commit robbery. For the purposes of § 19.03(a)(2), a person acts "intentionally" with respect to the result of his conduct (i.e., the death of his victim) when it is his conscious objective or desire to cause the result. See Tex.Penal Code § 6.03(a).

2. At the time of appellant's trial, Article 37.071 provided in relevant part:

(b) On conclusion of the presentation of the evidence [at the punishment phase of the trial], the court shall submit the following three issues to the jury:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

The record reflects that only issues (b)(1) and (b)(2) were submitted to the jury at appellant's trial.

circumstances of the offense that appellant intended to kill.

Viewed in the light most favorable to the jury's verdict, the evidence presented at the guilt/innocence phase of appellant's trial established the following: At approximately 2:30 p.m., November 28, 1990, appellant entered the Houston jewelry store of 43–year-old Chung Myong Yi. After browsing for a few minutes, appellant pulled a handgun out of his jacket, pointed it at Chung's head, and demanded money from him. Moments later, appellant shot Chung in the forehead from a distance of less than one foot. He then left the store carrying a box of jewelry. A subsequent expert examination of the handgun revealed that eight pounds of pressure on its trigger were necessary to fire it.

▆▆ Our determination of appellant's first point of error is governed by familiar principles. First, the jury, as the sole judge of the weight and credibility of the evidence, was free to accept or reject any or all of the evidence of either the State or the defense, even if that evidence was uncontradicted. *Vanderbilt v. State,* 629 S.W.2d 709, 716 (Tex.Crim.App.1981). Second, due process of law requires that appellant's conviction be supported by evidence sufficient to rationally prove all of the elements of the offense— including his intent to kill[3]—beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). Therefore, as an appellate court, our task is to consider all of the record evidence and reasonable inferences therefrom in the light most favorable to the jury's verdict and to determine whether, based on that evidence and those inferences, a rational jury could have found beyond a reasonable doubt that appellant intended to kill. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1973). Thus, our review is a very limited one. We do not act as a thirteenth juror re-evaluating the weight and credibility of the evidence. Rather, we act only "as a final, due process safeguard ensuring ... the rationality of the factfinder." *Moreno v. State,* 755 S.W.2d 866, 867 (Tex. Crim.App.1988).

Utilizing the required standard of review, we must reject appellant's insufficiency claim. A rational jury could certainly infer that appellant intended to kill from the manner in which he handled his weapon, the amount of pressure needed to fire the weapon, the distance from which he fired, the nature of the injury he inflicted, and his flight from the scene. See *Vuong v. State,* 830 S.W.2d 929, 934 (Tex.Crim.App.1992) (deadly manner of use of gun); *Turner v. State,* 805 S.W.2d 423, 427 (Tex.Crim.App. 1991) (heavy trigger pressure required to fire gun); *Thompson v. State,* 691 S.W.2d 627, 630 (Tex.Crim.App.1984) (short distance between victim and gun, and flight from scene).

In *Foster* we held that no rational jury could have found that the defendant intended to kill, but the evidence in that case was very different from the evidence adduced at appellant's trial. Admittedly, the evidence in *Foster,* like the evidence at appellant's trial, showed that the defendant shot and killed his victim at close range and that the defendant denied having the intent to kill. But in *Foster,* other evidence showed that (1) the defendant and the victim had a loving relationship on the evening of the shooting; (2) the weapon involved was defective and fired easily, even with its safety on; (3) after the shooting, the defendant promptly sought medical assistance for the victim and then notified the police; (4) the defendant freely admitted handling the weapon when it discharged; and (5) he was extremely distraught after the shooting. At appellant's trial, in contrast, there was abundant evidence from which a rational jury could conclude he intentionally shot Chung in the course of robbing him. Point of error number one is overruled.

▆▆ In point of error number two, appellant maintains the evidence adduced at his trial was insufficient to support the jury's affirmative answer to the second punishment issue, concerning his future dangerousness. See footnote two, *supra.* Appellant argues that

the only evidence presented by the State concerning the issue of whether [he] would

**3.** See footnote one, *supra.*

constitute a continuing threat to society was [his] involvement in several unadjudicated extraneous offenses and instances of misconduct. The State presented no character evidence and no psychiatric evidence. The appellant, on the other hand, presented psychiatric and psychological evidence [showing that he has a reasonable chance of being rehabilitated], evidence of [a relatively normal] family history, evidence of remorse, and evidence of current behavior without the effect of alcohol and drugs. Appellant argues further that he "was only 20 years of age when the act occurred." The State argues in response that "the evidence shows that appellant was on an extended, murderous rampage that culminated in the charged offense," and that, consequently, "[a] rational factfinder could conclude beyond a reasonable doubt that appellant would probably commit future acts of violence that would pose a continuing threat to society."

Viewed in the light most favorable to the jury's finding, the evidence at the punishment phase of appellant's trial established the following: On August 2, 1990, in Fort Bend County, appellant pled guilty to the felony offense of unauthorized use of a motor vehicle and was placed on probation for three years. He failed subsequently to meet any of the conditions of his probation.

At around 8:50 p.m., November 5, 1990, appellant participated in the aggravated robbery of an adult male at a self-service car wash in Houston. In the course of the robbery, appellant assaulted the victim.

At around 10:30 p.m., November 13, 1990, appellant participated in the aggravated robbery of a Houston convenience store clerk. In the course of that robbery, appellant's accomplice, Wilton Bethany, shot the clerk in the chest with a shotgun.

On the night of November 18, 1990, appellant and Bethany burglarized a clothing store in Houston and stole approximately $10,000 in merchandise.

At around 4:30 p.m., November 20, 1990, appellant drove a van into the parking lot of the Fondren Glen Apartments in Houston and, for no apparent reason, opened fire on two young males, shooting one in his arm, the other in his hand. A stray bullet shot a young female nearby. Later, on the night of November 20, appellant and Bethany burglarized a gun shop in Houston and stole $7,000 worth of guns.

At around 10:00 p.m., November 23, 1990, appellant and Bethany drove a car into the parking lot of the Westwood Village Apartments in Houston. After the car stopped, appellant and Bethany exited and started shooting for no apparent reason. Bethany shot two males who were standing in the parking lot. Appellant fired his weapon randomly into the apartments themselves, stating, "Don't fuck with me. I will kill all you whores." A few hours later, appellant and a second male drove a car into the parking lot of the Breckenridge Apartments in Houston. After coming to a stop, both appellant and his companion opened fire on several apartments, again for no apparent reason, shooting one occupant in his arm.

On the night of November 25, 1990, appellant and Bethany burglarized a second gun shop in Houston and stole 86 guns.

Finally, there was evidence that appellant had habitually abused alcohol, marihuana, and cocaine.

 Our determination of appellant's second point of error is again governed by familiar principles. First, the State carried the burden of proving beyond a reasonable doubt that the answer to punishment issue two was yes. Tex.Code Crim.Proc. art. 37.-071(c). Second, the jury, in answering punishment issue two, was entitled to accept or reject any or all of the evidence presented by either side at both the guilt/innocence and punishment phases of trial. *Valdez v. State,* 776 S.W.2d 162, 166–167 (Tex.Crim.App. 1989). As an appellate court, therefore, our task is to view all the evidence in the light most favorable to the jury's affirmative answer, and then determine whether, based on that evidence, any rational jury could have found, beyond a reasonable doubt, that the answer to the second punishment issue was yes. *Harris v. State,* 738 S.W.2d 207, 225–226 (Tex.Crim.App.1986).

 Utilizing the required standard of review, we must again reject appellant's in-

sufficiency claim. Prior adjudicated criminal acts, prior unadjudicated acts of violence against people and property, and habitual drug abuse have all been held by this Court to constitute evidence of future dangerousness. *Farris v. State*, 819 S.W.2d 490, 498 (Tex.Crim.App.1990). Furthermore, in answering special issue two, a rational jury need not give controlling weight to the defendant's relative youth or to a lack of psychiatric evidence indicating his future dangerousness. *Ellason v. State*, 815 S.W.2d 656, 663–664 (Tex.Crim.App.1991); *Huffman v. State*, 746 S.W.2d 212, 224 (Tex.Crim.App.1988). In short, considering the record evidence in the necessary light, we conclude that it was sufficient to rationally support an affirmative answer to the second punishment issue. Point of error number two is overruled.

In point of error number three, appellant complains of the trial court's refusal, at the punishment phase, to grant a mistrial after a prosecution witness was allowed to testify "without having a bench conference prior to the admission of her testimony." With respect to this point of error, the record reflects that: (1) appellant filed a pretrial motion in limine, which was granted, asking that the prosecution be prohibited from "mentioning in any manner" instances of uncharged misconduct without first approaching the bench and obtaining a ruling on admissibility; (2) the witness in question testified during the punishment phase about an instance of uncharged misconduct allegedly committed by appellant; and (3) appellant did not make his motion for mistrial until the conclusion of the State's case at punishment, long after the witness in question had testified.

Under these circumstances, appellant's complaint has not been preserved for appellate review. The granting of appellant's pretrial motion in limine certainly preserved no error. "For error to be preserved with regard to the subject matter of [a] motion in limine, it is absolutely necessary that an objection be made at the time when the subject is raised during the trial." *Gonzales v. State*, 685 S.W.2d 47, 50 (Tex.Crim.App.1985). Nor did appellant's untimely motion for mistrial preserve error. *Johnson v. State*, 803

S.W.2d 272, 291 (Tex.Crim.App.1990). Point of error number three is overruled.

In points of error numbers four through nine, appellant argues the trial court erred, at the punishment phase, in refusing to instruct the jury to disregard certain testimony of uncharged misconduct allegedly committed by appellant, and in refusing to grant his motion for mistrial based on the admission of that testimony. Appellant argues specifically that

[t]he State has wholly failed to prove offenses ... for the reason that the [State's] witnesses [did] not testif[y] to an offense under the laws of the state of Texas. Now, they [did] testif[y] to misconduct, possibly on the part of the defendant and others, but they [did] not testify to any [statutory] offense[s]. ...

We perceive no error. At the time of appellant's trial, Article 37.071(a) provided that, at the punishment phase of a capital trial, "evidence may be presented as to any matter that the court deems relevant to sentence." That language allowed the admission of uncharged misconduct, whether actually criminal or not. *Spence v. State*, 795 S.W.2d 743, 759 (Tex.Crim.App.1990).

Under points of error four through nine, appellant also argues that the admission of the uncharged misconduct evidence violated his federal and state constitutional rights to due process of law and equal protection of the laws. Since these arguments were not raised below, however, they are not preserved for appellate review. *Rezac v. State*, 782 S.W.2d 869, 870 (Tex.Crim.App.1990). Points of error numbers four through nine are overruled.

In his tenth point of error, appellant contends the trial court erred, at the punishment phase, in refusing to grant his motion for mistrial following the testimony of prosecution witness James McCowan concerning uncharged misconduct allegedly committed by Bethany. A careful reading of appellant's brief reveals, however, that he has not cited the pages in the record either where he moved for a mistrial or where his motion was denied. "Because the right to appellate review in this state extends only to complaints

made in accordance with our published rules of appellate procedure—which require an appellant to specify the pages in the record where the alleged error can be found—we hold that … appellant's complaint is inadequately briefed and not preserved for our review. Tex.R.App.Proc. 74 and 210." *Narvaiz v. State*, 840 S.W.2d 415, 429 (Tex.Crim. App.1992). Point of error number ten is overruled.

In point of error number eleven, appellant complains he "was denied a fair and impartial trial in that the foreperson of the jury … was selected without [his] knowledge that [the foreperson] knew and liked a State's witness, James McCowan." The record reflects, however, that this argument was not made in the trial court; therefore, it is not preserved for appellate review. *Rezac v. State*, 782 S.W.2d., at 870. Point of error number eleven is overruled.

In point of error number twelve, appellant argues "[t]he trial court erred in denying [his] request for mistrial due to the antagonistic position in which [defense] counsel was placed with [respect to] the foreperson of the jury." Relevant to this point of error, the record reflects the following facts: When the State called prosecution witness McCowan to the stand during the punishment phase, the foreperson of the jury immediately asked to approach the bench. The request was granted, and the foreperson approached the bench and, outside the hearing of the jury, told the court that she (i.e., the foreperson) had been acquainted with McCowan while in high school but that she had had no contact with him for at least five years. She also stated that her prior acquaintance with McCowan would not affect her evaluation of his testimony. The jury was then sent to the jury room, and defense counsel, with the court's permission, questioned the foreperson about her relationship with McCowan. In response to this questioning, the foreperson stated that McCowan's face was "familiar" to her and that she had spoken to him often "in passing" in high school eight years earlier. Defense counsel then moved for a mistrial on the ground that his questioning of the foreperson had unavoidably placed him in an "antagonistic" position with respect to her. The trial court denied the motion.

We see no error. The record reflects that defense counsel's questioning of the jury foreperson was brief and polite. There is no reasonable probability that the questioning antagonized the foreperson or otherwise threatened appellant's right to an impartial jury. Point of error number twelve is overruled.

In point of error number thirteen, appellant contends the trial court erred "in allowing James McCowan to testify after the testimony of the [jury] fore[man] concerning her relationship with … McCowan." Appellant argues that because of the trial court's action, he was "denied [the] effective assistance of counsel and was denied due process by not being allowed to have a fair trial." But, again, this argument was not made in the trial court; therefore, it is not preserved for appellate review. *Rezac v. State*, 782 S.W.2d, at 870. Point of error number thirteen is overruled.

Appellant argues in his fourteenth point of error that the trial court erred in denying his motion for mistrial after the prosecutor, in his final argument at the punishment phase, urged the jury to "disregard" the defense's psychiatric witnesses. With respect to this point of error, the record reflects that the trial court promptly instructed the jury not to consider the prosecutor's comment for any purpose, that appellant then moved for a mistrial, and that the motion was denied.

We will assume *arguendo* that the prosecutorial argument in question was improper. However, an instruction to disregard will cure such error unless the prosecutor's remark was so inflammatory that its prejudicial effect could not reasonably be overcome by such an instruction. *Kinnamon v. State*, 791 S.W.2d 84, 89 (Tex.Crim.App. 1990). In order for improper argument to absolutely mandate reversal, it must be extreme or inject new and harmful facts into the record. *Ibid.* Neither was the case here. Point of error number fourteen is overruled.

■ In point of error number fifteen, appellant argues the trial court erred in denying his motion for mistrial after the prosecutor, in his final argument at the punishment phase, urged the jury to answer the punishment issues affirmatively because "[t]here's no guarantee the defendant will stay in the penitentiary" if he were sentenced to life in prison. With respect to this point of error, the record reflects that the trial court promptly instructed the jury to disregard the prosecutor's remark, that appellant then moved for a mistrial, that the motion was denied, and that the prosecutor then explained to the jury that his previous comment had referred to the "possibility of escape."

Again, assuming *arguendo* that the prosecutor's remark was error, we see no necessity for a reversal. The prosecutor quickly explained to the jury that his comment had referred to the possibility of escape. Thus, since it is common knowledge in this state that prison inmates sometimes escape, we cannot say that the prosecutor's remark was extreme or injected new and harmful facts into the record. Point of error number fifteen is overruled.

■ Finally, in his sixteenth point of error, appellant argues that the prosecutor committed fundamental error when he used a Spanish aphorism during final argument at the punishment phase. Appellant argues specifically that he "has no means of determining whether the Spanish phrase was accurately transcribed, or [whether] the phrase was accurately interpreted." He complains further that he "has no means of knowing whether Spanish-speaking members of the jury were privy to information that other jury members, [he], and defense counsel were not privy to."

The relevant portion of the prosecutor's argument was as follows:

> Ponchai Wilkerson made his choices. He chose the easy life, he became a crooked man. Insofar as what he did with Wilton Bethany, there's a saying in Spanish: Dime con quien andas y te dire lo que eres. "Tell me who you run around with, and I will tell you what you are."

Appellant did not object to the prosecutor's comment.

Assuming *arguendo* that the prosecutor's comment was improper, appellant, since he did not object at trial, is entitled to a reversal on appeal only if the comment was so prejudicial that an instruction to disregard could not have cured the harm. *Harris v. State,* 827 S.W.2d 949, 963 (Tex.Crim.App.1992). Appellant has made no such showing. He has shown neither that the Spanish phrase was misinterpreted nor that any jurors even understood Spanish. Point of error number sixteen is overruled.

Having discerned no reversible error, we AFFIRM the judgment of the trial court.

CLINTON and OVERSTREET, JJ., concur in the result.

BAIRD, Judge, dissenting.

I respectfully dissent to the majority's disposition of appellant's second point of error. The United States Supreme Court has made it clear that the constitutionality of our State's capital sentencing scheme depends upon whether the jury has considered all the relevant evidence in making "an individualized assessment of the appropriateness of the death penalty." *Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989). *See also, Jurek v. Texas,* 428 U.S. 262, 272, 276, 96 S.Ct. 2950, 2956, 2958, 49 L.Ed.2d 929 (1976). In order for the jury to make such an individualized assessment it must consider the aggravating factors and the mitigating factors of both the offense and the particular defendant. In order to insure the jury fairly arrives at its decision, we established a non-exclusive list of eight factors, both aggravating and mitigating, with which to review the jury's assessment of the evidence supporting a sentence of death. *Keeton v. State,* 724 S.W.2d 58 (Tex.Cr.App. 1987). Since *Keeton,* we have consistently applied these factors to review the sufficiency of the evidence to support an affirmative answer to the second punishment issue. *See, Rousseau v. State,* 855 S.W.2d 666, 684–685 and n. 25 (Tex.Cr.App.1993), *Boggess v. State,* 855 S.W.2d 656, 661–663 (Tex.Cr.App. 1989), *Johnson v. State,* 853 S.W.2d 527, 532–533 (Tex.Cr.App.1992), *Vuong v. State,* 830

S.W.2d 929 (Tex.Cr.App.1992), *and Valdez v. State,* 776 S.W.2d 162, 166–167 (Tex.Cr.App. 1989). However, today, the majority, by focusing exclusively on the aggravating factors shirks "our responsibility in assuring the evenhanded application of the ultimate punishment. . . ." *Horne v. State,* 607 S.W.2d 556, 559 (Tex.Cr.App.1980). Thus, the majority's cursory "review" of the second point of error threatens the wanton and freakish imposition of the death penalty constitutionally prohibited by the Eighth Amendment. *See, Jurek,* 428 U.S. at 276, 96 S.Ct. at 2958 (1976).

## I.

Appellant contends the evidence is insufficient to support an affirmative answer to the second punishment issue. In *Ellason v. State,* 815 S.W.2d 656, 658 (Tex.Cr.App.1991), we stated:

> In deciding whether there is sufficient evidence to support a jury's affirmative finding to the second special issue, that there is a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society, the evidence is to be viewed in the light most favorable to the finding to determine whether any rational trier of fact could have answered, beyond a reasonable doubt, special issue number two in the affirmative.

However, even with the foregoing in mind, we must remember that "death is a punishment different from all other sanctions in kind rather than degree." *Woodson v. North Carolina,* 428 U.S. 280, 303–304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). Because of the uniqueness of the death penalty

> fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

*Id.,* 428 U.S. at 304, 96 S.Ct. at 2991. *See also, Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 2933, n. 38, 49 L.Ed.2d 859 (1976) ("[I]t is constitutionally required that the sentencing authority have information sufficient to enable it to consider the character

and individual circumstances of a defendant prior to imposition of a death sentence.").

The constitutionality of our capital sentencing scheme depends upon the sentencer's ability to consider both the aggravating *and* the mitigating circumstances of a crime. *Penry v. Lynaugh,* 492 U.S. 302, 316, 109 S.Ct. 2934, 2945, 106 L.Ed.2d 256 (1989); *California v. Brown,* 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987); *Jurek v. Texas,* 428 U.S. 262, 271, 96 S.Ct. 2950, 2956, 49 L.Ed.2d 929 (1976). In *Jurek,* the United States Supreme Court upheld the constitutionality of our capital sentencing scheme. The constitutionality of the scheme turned on whether the punishment issues allowed "consideration of particularized mitigating factors." *Id.,* 428 U.S. at 272, 96 S.Ct. at 2956. The Supreme Court held:

> . . . By authorizing the defense to bring before the jury at the separate sentencing hearing whatever mitigating circumstances relating the individual defendant can be adduced, Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function. By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational and consistent imposition of death sentences under law. Because this system serves to assure that sentences of death will not be "wantonly" or "freakishly" imposed, it does not violate the Constitution.

*Id.,* 428 U.S. at 276, 96 S.Ct. at 2958 (citation omitted). Therefore, when reviewing a sentence of death

> we are bound by the law to make certain that the death sentence is not "wantonly or freakishly" imposed, and that the purposes of the jury's consideration of the two special issues set forth in Art. 37.071(b) . . . are accomplished.

*Keeton v. State,* 724 S.W.2d at 64. *See also, Jurek,* 428 U.S. at 276, 96 S.Ct. at 2958.

In *Lackey v. State,* 819 S.W.2d 111 (Tex. Cr.App.1989), the Court stated that the "appropriate analysis [under the statutory punishment issues] [is] to focus . . . on an individualized assessment of the capital defen-

dant for 'deathworthiness.'" *Id.*, at 132. The jury must weigh the aggravating elements of the crime against any mitigating evidence and determine whether the defendant poses a continuing threat to society. If the defendant poses such a threat, a sentence of death is merited. However, if the mitigating evidence suggest the defendant is not a continuing threat to society, in essence, that the defendant may be rehabilitated, a sentence of death may not be imposed.

Consequently, in evaluating whether there is sufficient evidence to support a finding that the defendant poses a *continuing* threat, this Court must bear in mind the place rehabilitation has in our criminal justice system. *See, Kelly v. Robinson*, 479 U.S. 36, 52, 107 S.Ct. 353, 362, 93 L.Ed.2d 216 (1986), *United States v. Brown*, 381 U.S. 437, 458, 85 S.Ct. 1707, 1720, 14 L.Ed.2d 484 (1965), *and Williams v. New York*, 337 U.S. 241, 248, 69 S.Ct. 1079, 1084, 93 L.Ed. 1337 (1949). *Compare*, Tex.Penal Code Ann. § 1.02(1). In *Atiyeh v. Capps*, 449 U.S. 1312, 1314, 101 S.Ct. 829, 830, 66 L.Ed.2d 785 (1981), the Supreme Court noted that "rehabilitation" is not the only Constitutionally sanctioned policy behind punishment. Indeed, in the context of capital punishment, punishment based upon the "retributive theory" of justice is Constitutionally permissible. *Id.* (citing *Gregg v. Georgia*, 428 U.S. at 184, 96 S.Ct. at 2930, n. 30). However, the Court in *Gregg*, and in its companion cases *Jurek* and *Woodson* cautioned that a capital sentencing scheme would not pass constitutional muster where it merely focused on punishing the defendant. Rather, in addition to aggravating elements of an offense, a punishment scheme must permit the jury to consider the individual's character and circumstances which militate against a punishment of death. *Gregg*, 428 U.S. at 189, 96 S.Ct. at 2932–2933, *Woodson*, 428 U.S. at 303–305, 96 S.Ct. at 2291–2292, *Jurek*, 428 U.S. at 272–274, 96 S.Ct. at 2956–2957. In the context of our capital sentencing scheme, the second punishment issue satisfies constitutional requirements because it requires the jury to consider "not only why a death sentence should be imposed, but also

why it should not be imposed." *Jurek*, 428 U.S. at 271, 96 S.Ct. at 2956.

Thus, the second punishment issue, concerning whether the defendant poses a continuing threat to society, subsumes the question of whether the defendant can be rehabilitatable in prison. Consequently, where the evidence suggests that the defendant is subject to being rehabilitated, the evidence is insufficient to prove beyond a reasonable doubt that the defendant poses a continuing threat and a sentence of death will not be sustained.

## II.

In *Johnson v. Texas*, —— U.S. ——, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993), the Supreme Court noted with approval this Court's comprehensive criteria in reviewing the sufficiency of the evidence to support a finding that the defendant represents a continuing threat to society. *Id.*, —— U.S. at ——, 113 S.Ct. at 2671. The Court further stated:

> The Texas Court of Criminal Appeals' view of the future dangerousness inquiry supports our conclusion that *consideration of the second special issue is a comprehensive inquiry that is more than a question of historical fact.*[1]

*Id.*, —— U.S. at ——, 113 S.Ct. at 2671. Thus, our review of the sufficiency of the evidence is not merely a recitation of the reasons a defendant should die but must be a "comprehensive inquiry" into the individual characteristics of the defendant and the circumstances of the offense.

However, the majority's emphasis on appellant's twenty-five day crime spree, to the exclusion of the other relevant evidence, reduces our review to a mere recital of "historical fact." *See*, Majority Op., pp. 324–326. This selective focus not only disregards the Supreme Court's sanction of our sufficiency review in *Johnson*, but disregards this Court's own precedent. *See, Keeton v. State*, 724 S.W.2d 58 (*and cases cited therein*). Therefore, because the majority refuses to do so, I find it necessary to address *all* the

---

1. All emphasis is supplied unless otherwise indicated.

evidence, both aggravating and mitigating, presented in the instant case.

Eunice George, a Fort Bend County probation officer, testified that appellant was placed on three years deferred adjudication for the offense of the unauthorized use of a motor vehicle on August 8, 1990. Although appellant was ordered to report to George once a month, he only reported for the initial interview. Appellant made no restitution payment and failed to comply with the conditions of probation.

The State introduced evidence of numerous unadjudicated offenses committed by appellant, constituting to a twenty-five day crime spree which culminated in the instant offense.

Anthony Jolivet testified that on November 5, 1990, at around 8:50 p.m., two men, one of whom had a gun, approached Jolivet at a carwash and stole his vehicle. Jolivet identified appellant as the man *without* the gun. Appellant held Jolivet's wrists while appellant's accomplice held the gun. While the accomplice looked for the keys to Jolivet's vehicle, Jolivet tried to break away. Appellant tackled Jolivet and the two men struggled until the accomplice pointed his gun in Jolivet's face. The accomplice then returned to the vehicle and resumed his search for the keys. Jolivet finally succeeded in escaping. Jolivet eventually recovered his car; however, a watch, some clothing, credit cards, checkbooks, car mats and about $30 in cash were never recovered.

Eddie Bolden testified that he was with Kenneth Joseph, Wilton Bethany, and appellant on November 13, 1990. Bolden, Joseph, Bethany, and appellant were searching for a car to steal. *They dropped off Bethany, who broke into and stole a Suburban.* Appellant got behind the wheel and followed Bethany to Joseph's apartment to pick up a person named Erica. Appellant, Bethany, Joseph, Bolden and Erica drove the Suburban to another man's house and picked up a .20

gauge shotgun. Bolden then asked to be taken home. Bolden's home was a block away from a Shop N' Get convenience store. *Bethany suggested that they rob the Shop N' Get.* Bolden refused to participate because he had known the clerk, Zahir Ali for two or three years. Bethany parked the car next to the telephone booth at the convenience store. While Erica and Bolden lay down in the back seat, appellant and Bethany exited the vehicle and Joseph got in the front seat. Appellant carried a .25 automatic, and Bethany carried the shotgun. While Bethany and appellant were inside the store, Bolden heard "two or three" gunshots. After the robbery, *Bethany said, "I shot him."*

Zahir Ali testified that he was robbed and shot at the Shop N' Get store on November 13, 1990. Two men, one armed with a shotgun, entered the store. The man *with the shotgun hit Ali in the head with the butt of the gun.* The other man came around the counter and attempted to open the register. When that man was unable to open the register, the man with the shotgun shot at the ceiling. The other man continued trying to open the register. The *man with the shotgun then fired the shotgun at Ali, hitting him in the arm and chest.* The two men then left. Both men were black.[2]

Bolden also testified that on November 20, 1990, he, Bethany and appellant drove to the Fondren Glen Apartments. Two boys were sitting on a fence. One of the boys exchanged words with appellant. Appellant said "you talking to me" and shot at the boys. Both boys ran. Appellant said, "I think I missed them." *Bethany said, "Man, you weak. You missed them and he was that close to you."* They later heard that an errant bullet hit a little girl.

Jimmy Johnson testified that on November 20th, at around 4:30 or 5:00 in the afternoon, he was talking to his brother-in-law, Jarrode Turner, at the Fondren Glen Apartments. Appellant drove up in a van with two other men and exchanged words with Johnson.

---

2. A hearing was held outside of the presence of the jury for the purpose of determining whether Ali would be allowed to testify. Ali, a Pakistani, apparently had a very poor command of the English language. Because Ali's testimony was so confusing, the trial judge ruled that Ali would be allowed to testify as to the events of the extraneous offense in which he was shot and robbed, but he would *not* be allowed to identify his assailants. However, comparing Ali's testimony with Bolden's, *it appears that Bethany shot Ali.*

Neither Turner nor Johnson knew appellant. Appellant pulled a gun and fired at Johnson and Turner as they ran away. Appellant shot Johnson through the arm and Turner in the hand. That same evening, appellant burglarized the Alamo Gun Shop. Bolden, Bethany and appellant rammed a station wagon into the store to steal weapons. Judith A. Chmiel, the owner, testified the store was burglarized on November 20, 1990. Twenty-eight guns worth seven thousand dollars were taken.

James McCowan testified that on November 23, 1990, at 10:00 p.m., he was shot in the parking lot of the Westwood Village Apartments. McCowan was with a group of people in the parking lot. Appellant, Bethany and another man drove up and stopped a few feet from the group. *Bethany got out of the car and "opened fire into the crowd" with an automatic weapon.* Three shots hit Bobby Earl Holley, one through the arm and two in the back, killing him. Bethany told McCowan to stop. McCowan did not stop, and was shot *by Bethany* in the left heel. McCowan hid in the bushes. Appellant, who was out of the car, opened fire on the apartments with an automatic weapon. Appellant said, "Don't fuck with me. I will kill all you whores." Another man in the back seat of appellant's vehicle was also shooting; the three men then drove away.

Greg Mayes, a resident of the Breckenridge Apartments, testified that on November 24, 1990, appellant and another man drove up and fired an *automatic weapon at a group of teenagers and young children* standing outside of an apartment at the Breckenridge Apartments. One child was hit in the arm.

A Houston police officer testified that he recovered a stolen Buick Regal at the Regency Walk Apartments, where appellant lived. There were several weapons in the car and spent cartridge casings on the ground outside the car. Appellant's fingerprints were on one of the weapons. The Breckenridge Apartments were directly across the street from the Regency Walk Apartments.

Appellant gave a written statement to police officers stating that he had committed two gun shop burglaries and the burglary of

Coco Fashions. Chmiel, owner of the Alamo Gun Shop, identified several of the guns as being stolen from her store. Beth Ann Boyd, an employee of Collectors Firearms, testified that on November 25, 1990, the store was burglarized. Among the guns taken in that burglary was a Glock .9 millimeter pistol, serial number MZ264, the gun appellant used to kill the decedent. Juan Ferrero, the owner of Coco Fashions, testified that on November 26, 1990, someone rammed a vehicle into his store and stole $10,000 worth of merchandise.

Sergeant D.A. Ferguson of the Houston Police Department's homicide division testified that on November 29, 1990, he recovered weapons and the decedent's jewelry from appellant's home. Ferguson also recovered: clothing from Coco Fashions; tags from Collectors Firearms; the Glock pistol used to kill the decedent; jewelry trays from Royal Gold Jewelry; and the shotgun used to shoot Ali. In all thirty-four weapons were recovered from appellant's home.

Appellant testified that he was nineteen years old at the time of the offense. He further testified that on November 28, 1990, he and Bethany went to Royal Gold Jewelry to purchase a pendant. After Bethany purchased some items, appellant decided to rob the decedent. Appellant went outside, retrieved a gun, returned to the store and demanded money from the decedent. According to appellant, the decedent made a sudden motion and appellant shot him. Appellant ran out of the store and started the car. When Bethany did not follow, appellant went back and met Bethany exiting the store carrying jewelry trays. The two then drove away.

At the punishment phase of the trial, appellant presented the following mitigating evidence:

Appellant presented testimony by two psychological experts, Dr. Jerome Brown, a clinical psychologist, and Dr. Priscilla Ray, a psychiatrist.

Dr. Brown testified that he examined appellant with two questions in mind: (1) "[T]he first has to do with trying to understand his personality in terms of whether or

not this young man is still salvageable, any hope of rehabilitation for him[;]" and (2) "The second question was try to determine why exactly all this happened in the first place." After conducting a number of tests and interviews, Dr. Brown determined that appellant's personality was within the normal range. Consequently, appellant would not have trouble controlling his behavior and that he was capable of forming attachments to other people.[3]

Dr. Brown stated the most important finding "was that there was no evidence of significant pent up or poorly controlled hostility that's ready to explode or erupt at slight provocation," characteristic of those who commit violent crimes. Appellant lacked "severe extreme personality characteristics in the negative direction." Dr. Brown testified:

> The lack of extremes, I think, in this particular profile is what is prominent. In other words, whatever problems he's having are not at the extreme ends. Again, the *extremities are what we are looking for when we look for individuals who are likely to commit violent crimes or have committed violent crimes.*

Dr. Brown explained that there were a number of positive factors which indicated appellant's prognosis for rehabilitation was good: (1) appellant's formative years were stable, his behavior lacking indications of "antisocial or criminal personality development"; (2) nor did appellant display indications of violent or anti-social behavior in his adolescent years; (3) appellant's family history was stable up until his parents divorced, when appellant was twelve; (4) appellant attended school through the twelfth grade; (5) while attending school, appellant held jobs, indicating he possessed a sense of personal and familial responsibility; (6) upon graduating, appellant attempted to join the Marine Corps; (7) appellant voluntarily discontinued using illegal drugs years prior to the instant offense; (8) because of appellant's youth, twenty years old at the time of trial, "his personality formation [was] still going on,"

rendering him subject to rehabilitative influences; and finally, (9) appellant's psychological tests indicated he had a stable personality.

Dr. Brown also listed appellant's negative factors for rehabilitation: (1) appellant's heavy alcohol consumption; (2) the absence of appellant's father in his life from the time he was twelve; (3) appellant's inability to maintain a job for very long; (4) appellant's extraneous crimes in addition to the capital murder; and finally, (5) appellant's denial of some of the additional crimes.

In discussing the negative factors with appellant's prognosis for rehabilitation, Dr. Brown noted that appellant had been doing reasonably well when his antisocial behavior erupted in "a very, very sudden and kind of explosive fashion. In other words, something happened, these things erupted because pretty much before that his antisocial activity, his criminal activity was minimal."

In spite of appellant's sudden violent behavior, Dr. Brown explained appellant lacked the kind of emotional detachment which impedes rehabilitation. Dr. Brown testified appellant was still attached to his family and did "not show the coldness and the shallowness of feeling that many of the more severe criminal types do show."

Moreover, appellant showed remorse over killing the decedent. Dr. Brown testified:

> [T]here [were] several examples of that in addition to just his stating to me that he felt badly about what happened and he thinks a lot about the offense, what happened to the man and about the man's family. He also has called his mother and confessed to her what he did and confessed to her about his thinking, constantly thinking about the family and what happened to them ... He has also asked forgiveness and has worked with the chaplain in the jail and expressed remorse in that situation with him. He continues to be bothered by thoughts of it. He was bothered the day he was arrested about it. *He was still being bothered about it then and so*

**3.** Dr. Brown conducted two clinical interviews and tested appellant with the following psychological tests: the "Rorschach ('ink blot') technique," the "M.M.P.I. and supplement," and the

"16 personality questionnaire." In addition, Dr. Brown interviewed appellant's mother and reviewed documents concerning appellant's history.

*the idea that he cannot shake it, he cannot get rid of this image of what he did or what he's done, the damage that he's done, I think, is again a positive sign in that it shows some capacity for, for guilt and feeling bad about his actions.*

Additionally, appellant wrote a letter to the decedent's family expressing his remorse.

Dr. Brown opined that appellant's crime spree of November 1990 may have resulted from a bad employment situation during his stay in Dallas and compounded by his new friends after returning to Houston. While in Dallas, appellant worked at a job for which he was not paid. Dr. Brown testified:

I think at that point he returned to Houston and was disillusioned and dissatisfied enough with his attempts to do it the right way, whatever all that meant, all of his life, that he was very, *very susceptible at that point to influence from a group of peers who were antisocial or criminal in their intentions.*

Dr. Brown emphasized, *"I think it's critical that he returned to Houston and became involved with this antisocial group, in other words, accomplices who had criminal intentions."*

According to Dr. Brown, appellant's crimes may also have been motivated by anger at his father for rejecting him. Appellant's father was an employee of the Harris County Sheriff's Department. Dr. Brown testified about appellant's relationship with his father:

There are occasions that [appellant] through his life tried very hard to identify with his father for a long time. This was a very difficult job for him because his father was not a very significant presence in his life. He was gone a lot, absent a lot from the family. But there were attempts to identify with the father all the way through adolescence and only in the later part of adolescence do I believe that he gave up on identifying with his father.

Dr. Brown further testified:

He would—he would try to figure out ways to talk to his father or to bring them together and he was pretty consistently told he was too busy, he couldn't do it, that kind of thing. He would sit on his bed and cry and try to figure out ways why his father would not be more involved with him and talk to himself and have conversations with his father alone in his room.

Dr. Brown testified that he had declined previous offers from the prosecutor to testify as to a defendant's future dangerousness because it is "considered unethical for mental health psychologists to testify to future dangerousness or lack of dangerousness because it simply can't be done with the instruments and the state of our technology today." He added that he could not say "absolutely" that appellant would not be a threat to society. Finally, when asked to consider appellant's extraneous crimes, Dr. Brown admitted, given the crimes, "it's a harder case than I am making him to be based upon the other things I told you."

Appellant also presented the psychological testimony by Dr. Priscilla Ray. Dr. Ray recounted appellant's family history. Appellant lived with his mother after his father left the family. Appellant then moved in with his father and stepmother, who disapproved of appellant contacting his mother or dating. Later, appellant moved back in with his mother. However, appellant eventually ended up living "on the streets," moving in with different people.

Dr. Ray testified that appellant had a distant relationship with his father. When appellant was not living with his father, his father would rarely contact him and would not invite appellant into his home. Appellant did, however, have good relationships with his siblings and step-siblings. Appellant's relationship with his mother was "fairly good."

Dr. Ray noted that appellant started drinking at the age of sixteen, using marihuana at seventeen, and then began smoking marihuana laced with cocaine. He quit using drugs at the insistence of his girlfriend, but continued to drink daily. Dr. Ray testified that appellant and Bethany had been drinking the day of the instant offense. She further testified that drinking lowers impulse control.

From appellant's social history, Dr. Ray concluded appellant did not suffer from anti-social personality disorder:

The diagnosis of an *antisocial personality disorder previously called sociopathic is basically one that we associate with people who are long-term criminals,* that don't have the ability to view other people's feelings at all or to function in society. And that requires certain criteria that occurs before the age of 15, a certain number of them. And he does not meet that criteria.... *My impressions, in summary, was he did not appear to meet criteria for antisocial personality disorder.*

Dr. Ray noted appellant expressed remorse over his crime.

Dr. Ray testified that appellant did "meet the criteria for alcohol and substance abuse." Further, Dr. Ray attributed appellant's criminal behavior to drugs, alcohol and the lack of a structured environment. She opined that appellant's behavior would "adjust to a structured environment relatively well." Furthermore, Dr. Ray testified that in-patient drug and alcohol treatment offered in prison would benefit appellant:

Treatment for alcohol and substance abuse doesn't necessarily help the personality but I think it would help him, first of all, not to be under the influence of alcohol and drugs, and second of all, would give him a more structured setting in his life in general, a format, for example, Alcoholics Anonymous or a 12 Step Program to add some structure to his life and help him develop more socially appropriately.

Dr. Ray further testified that appellant "recognized his need for help" and attended an A.A. meeting while incarcerated.

Marilyn Skinner, a family friend, testified about the effect upon appellant of his father's rejection. Skinner stated she had known appellant since he was six years old and that he had been "a very sweet, affectionate little boy," who had "idolized" his father. Appellant was "very hurt" when his father left home, and had not since reconciled with his father. Skinner stated, "His father literally abandoned the family financially and the mother worked about as many hours a day as any person could work to keep the house paid for, the mortgage payments, the food, everything. The mother did everything, not the father."

George E. Burrell, staff chaplain at the Harris County Sheriff's Department, testified he and appellant prayed together and talked over Biblical scripture between thirty and thirty-five times since appellant's incarceration. Appellant cried during some of these sessions and expressed remorse over killing the decedent.

Appellant's mother, Soodjai Wilkerson, testified that appellant cried and asked her forgiveness for killing the decedent.

Ron Knotts, an investigator for the district attorney, testified that appellant had no disciplinary problems as a high school student.

Furthermore, two Harris County Sheriff's Department deputies testified that appellant had no disciplinary problems since arriving in jail.

In summarizing the evidence, it appears that appellant, then age nineteen, went on a crime spree in response to a disappointing employment situation compounded by his troubled relationship with his father. In addition, appellant's new friends strongly influenced his sudden criminal conduct. It is significant that prior to appellant's crime spree, his life was relatively unmarked by conflicts with the law. Except for a single instance of unauthorized use of a motor vehicle which took place in March of 1990, all of appellant's crimes occurred during a twenty-five day period in November of 1990.

### III.

Appellant urges this Court to reform his sentence from death to life imprisonment. As noted above, when evaluating the sufficiency of the evidence to support an affirmative answer to the second punishment issue there are several factors we consider, including:

1. the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or in concert with other parties;

2. the calculated nature of the defendant's actions;

3. the forethought and deliberateness exhibited by the crime's execution;

4. the existence of a prior criminal record and the severity of the prior offenses;

5. the defendant's age and personal circumstances at the time of the commission of the offense;

6. whether the defendant was acting under duress or intoxication or under the domination of another at the time of the commission of the offense;

7. the lack of psychiatric evidence concerning future dangerousness; and,

8. any relevant character evidence.

See, Keeton, 724 S.W.2d at 61. "Of course, no one factor is dispositive, and the jury's affirmative answer to special issue two may withstand a sufficiency challenge notwithstanding the lack of evidence relating to one or more of these factors." Vuong v. State, 830 S.W.2d 929, 935 (Tex.Cr.App.1992). Nonetheless, a review of the sufficiency of the evidence to support a finding of a continuing threat necessarily involves a balancing between the aggravating and mitigating evidence presented at trial. See, Lane v. State, 743 S.W.2d 617, 630 (Tex.Cr.App.1987); see also, Lackey v. State, 819 S.W.2d 111, 123–128 (Tex.Cr.App.1989) (Teague, J. dissenting op.). Therefore, while the absence of certain aggravating evidence might not render the evidence insufficient to support an affirmative answer to the second punishment issue, the overwhelming presence of mitigating evidence may.

In order to determine whether the evidence is sufficient, we may examine other cases where the State failed to present sufficient evidence. Keeton, 724 S.W.2d at 61. I will review those cases in light of the aforementioned factors and the evidence in the instant case.

### 1. Circumstances of the Offense

Although the circumstances of the offense alone may be sufficient to sustain the jury's affirmative answer to the second punishment issue, Black v. State, 816 S.W.2d 350, 355 (Tex.Cr.App.1991), this Court has required those circumstances to be so heinous as to display a "wanton and callous disregard for human life." Deeb v. State, 815 S.W.2d 692, 703 (Tex.Cr.App.1991); O'Bryan v. State, 591 S.W.2d 464, 481 (Tex.Cr.App.1979). For example, in Joiner v. State, 825 S.W.2d 701, 704 (Tex.Cr.App.1992), the Court found the evidence sufficient to support an affirmative response to the second punishment issue where the defendant murdered two women. At trial, a medical examiner testified that "[t]he first complainant, was found to have been stabbed four times in the chest and ... received a series of lacerations on her neck. The second complainant suffered forty-one stab wounds to her chest, blunt force trauma to her head, lacerations to the head, and her throat had been ... 'slashed.' Physical evidence further suggested that each complainant was sexually assaulted by appellant after their deaths." Id., at 704. In finding the evidence sufficient, the Court stated:

The evidence presented in this case demonstrates a complete disregard for the sanctity for human life. Appellant not only took the lives of the two complainants herein but disfigured and brutalized their bodies. Appellant's actions appear cold, deliberate and calculated.

Id., at 705.

By contrast, in Brasfield v. State, 600 S.W.2d 288 (Tex.Cr.App.1980), the defendant kidnapped and murdered a six-year-old boy. A pathologist testified the decedent had died of asphyxiation. In addition, the decedent had received a heavy blow to the head, leaving a bruise, as well as numerous stab wounds, inflicted after death. Id., at 292. The decedent's trousers were pulled down around his legs, but his body was in too advanced a stage of decomposition to determine whether he had been sexually molested. At the punishment stage of the trial, the State offered no evidence that Brasfield would constitute a continuing threat. Nor did Brasfield offer any mitigating evidence on his own behalf. Reviewing the evidence, the Court held although "... we have a crime of violence adequately supported by the circumstantial evidence ... we are led to the inescapable conclusion that the evidence was insufficient to support an affirmative answer to the second issue." Id., at 293–294.

Moreover, in *Smith v. State,* 779 S.W.2d 417 (Tex.Cr.App.1989), the defendant tied up the decedent, raped her and then stabbed her fourteen times. A forensic pathologist characterized the death as "brutal," but not "extremely brutal." *Id.,* at 419. The Court held: "We cannot conclude the circumstances of the offense are so heinous or evince an 'aberration of character' so peculiarly 'dangerous' as alone to justify an affirmative response to the second special issue." *Id.*

With regard to appellant's case, while this Court has acknowledged that most murders committed in the course of a robbery are clearly senseless, *Beltran v. State,* 728 S.W.2d 382, 390 (Tex.Cr.App.1987), it has repeatedly held that not every such murder automatically merits capital punishment. *See, Keeton,* 724 S.W.2d at 62, *and, Roney v. State,* 632 S.W.2d 598, 603 (Tex.Cr.App.1982).

In *Keeton,* 724 S.W.2d 58, the defendant was convicted of capital murder committed in the course of a robbery. Keeton entered a grocery store and asked a clerk for directions to the location of an item. After the clerk and the store owner gave Keeton directions, without warning, Keeton shot the clerk and fired at the store owner. Keeton then went behind the cash register and stole the victims' purses. In reviewing the evidence, the Court held:

> Although the facts of the instant case show that appellant acted in a violent and aberrant way, we are forced to conclude that there was insufficient evidence to show that he would pose a future threat of violence to society.

*Id.,* at 64.

In *Beltran v. State,* 728 S.W.2d 382, the defendant was also convicted of capital murder committed in the course of a robbery. Beltran, who was twenty-five years old, entered a tortilleria and demanded money. Beltran shot the decedent immediately after she handed Beltran money from the cash drawer. In reviewing the evidence, the Court observed that the killing itself, though "senseless and unnecessary" was insufficient to support a finding of future dangerousness. *Id.,* at 390.

In *Roney,* 632 S.W.2d 598, the defendant committed a murder in the course of a robbery. Roney and two accomplices entered the store and held two clerks at gunpoint. After taking money from the register, the accomplices exited the store and waited in their car. Immediately before leaving, Roney shot one of the clerks at close range. At trial, the surviving clerk testified that the decedent had his hands raised when Roney shot him. *Id.,* at 602. In reviewing the evidence, the Court observed that "[t]he facts of his offense, standing alone, [did] not carry the marks of a 'calculated and cold-blooded' crime" that proved Roney to be a continuing threat to society. *Id.,* at 603. The Court continued:

> ... To hold that the facts of *this* offense, standing alone, would support such a verdict [of death] would mean that virtually every murder in the course of a robbery would warrant the death penalty. Such a construction would destroy the purpose of the punishment stage in capital murder cases, which is to provide a reasonable and controlled decision on whether the death penalty should be imposed, and to guard against its capricious and arbitrary imposition.

*Id.* (Citations omitted.) (Emphasis in original.)

The circumstances of appellant's offense, standing alone, do not "carry the marks of a calculated and cold-blooded crime." *Roney,* 632 S.W.2d at 603. In *Keeton,* the defendant shot the decedent prior to demanding money and without notice. In *Beltran,* the defendant shot the decedent immediately after she handed him money. In *Roney,* the defendant shot the decedent without provocation after the robbery was completed. By contrast, appellant shot the decedent when the decedent allegedly made a sudden movement. Thus, there is some evidence that appellant was provoked. *See, Warren v. State,* 562 S.W.2d 474, 476 (1978). Although this was a senseless murder, the circumstances of the killing were not so heinous as to display a "wanton and callous disregard for human life." *Deeb v. State,* 815 S.W.2d at 703.

## 2. and 3. Calculation and Forethought of the Offense

This Court has also examined the calculated nature of a defendant's acts and the forethought with which he planned and executed his crime in order to determine his propensity to commit future acts of violence. *O'Bryan*, 591 S.W.2d at 480.

In *Ellason v. State*, 815 S.W.2d 656 (Tex. Cr.App.1991), the nineteen-year-old defendant was convicted of capital murder after he stabbed an elderly neighbor to death when she awoke and recognized him as he was burglarizing her house. The evidence indicated the defendant entered the decedent's house unarmed and stabbed the decedent in a "split second decision" after panicking upon being recognized. *Id.*, at 659. In reforming Ellason's death sentence, the Court observed:

> ... There is no evidence that [Ellason] preplanned the burglary or the murder. [Ellason's] murder of [the decedent] appears to have been an immediate reaction to being recognized by [the decedent] after she unexpectedly awoke ... Moreover, the facts show that [Ellason] entered [the decedent's] residence unarmed and did not look for a weapon with which to arm himself while burglarizing [the decedent's] residence. It was not until [Ellason] was fleeing the scene, after having been recognized by [the decedent], and half way out the back door of the residence, did he contemplate using any type of violence on [the decedent].

*Id.*, at 662.

In *Beltran*, 728 S.W.2d 382, the defendant shot the decedent after she handed him money. In reforming Beltran's death sentence, the Court stated:

> ... [T]he instant murder case was clearly senseless and unnecessary as most murders committed in the course of a robbery are. [However], *[t]here was no showing that the robbery was long in planning or that the murder or violence was intended although the appellant was armed when he entered the store.*

*Id.*, at 390.

In *Garcia v. State*, 626 S.W.2d 46 (Tex.Cr. App.1982), the defendant was convicted of murder committed in the course of robbing a Mexican national who had illegally crossed the border. At first, Garcia agreed to give the decedent a ride to a taxi stand but instead, Garcia robbed the decedent and then shot him in the head. In reforming Garcia's death sentence, the Court remarked: "This was not a case where the robbery feature was long in the planning stage or a case where an armed individual drives around searching for a robbery, intending to use violence if necessary." *Id.*, at 51.

In *Warren v. State*, 562 S.W.2d 474, the defendant was convicted of capital murder committed in the course of a burglary. While burglarizing the decedent's home, Warren, twenty-five years old, found a pistol. Later, the decedent discovered Warren and threatened to kill him. In response to the threat, Warren pulled the pistol and killed the decedent. In reforming Warren's death sentence, the Court noted that Warren had only intended to burgle the decedent's home and had acted under provocation. *Id.*, at 476. We concluded that "the facts of the instant case reflect a criminal act of violence, *but it was not a calculated act.*" *Id.*

In the instant case there is no evidence that the robbery was "long in planning or that the murder or violence was intended...." *Beltran*, 728 S.W.2d at 390. *See also, Garcia*, 626 S.W.2d at 51. Appellant formed the intent to rob late in the course of events, as did Beltran and Garcia. Appellant testified that he entered Royal Gold Jewelry to purchase a pendant and decided to rob the decedent only when he saw money in the decedent's hands. Moreover, the evidence suggests that the shooting was not calculated but was provoked by a sudden motion by the decedent. *Compare, Warren*, 562 S.W.2d at 476. Appellant testified that he shot the decedent because he believed that the decedent was "going for a gun or the phone." Thus, the evidence suggests that rather than committing a calculated robbery-murder, appellant made an impromptu decision to commit the robbery and then shot the decedent after panicking at the decedent's sudden movement.

### 4. Existence of a Prior Criminal Record and its Severity

The existence of a prior criminal record and the severity of the prior crimes is also pertinent to our review of the sufficiency of the evidence. The Court has addressed this issue where the extraneous crimes presented at punishment were part of a crime spree.

In *Williams v. State*, 668 S.W.2d 692 (Tex. Cr.App.1983), we found the evidence sufficient to support an affirmative answer to the second punishment issue. Williams was convicted of capital murder committed in the course of a robbery and an attempted robbery. In the first robbery, Williams and an accomplice, agreed to rob a convenience store. Williams gave the accomplice his parents' pistol and acted as lookout while the accomplice shot the store attendant and took the money. Hours later, Williams and the accomplice went to a convenience store where Williams had previously worked. Inside, they approached the counter and Williams shot the store attendant, a former co-worker, before attempting to take the money. The Court affirmed Williams' death sentence, holding:

> ... [I]n the present case [Williams'] statements show that he and [the accomplice] planned the death of both store attendants several hours, not minutes, apart ... After participating in [the first] capital murder [Williams] selected the second victim, a former coworker, *a man he knew would recognize him.* The jury was entitled to infer that when appellant drove to the second store he had every intention of killing the attendant in a "calculated and cold-blooded" manner, in order to make sure there were no witnesses.

*Id.,* at 695–696. (Emphasis in original.)

In *Brooks v. State*, 599 S.W.2d 312 (Tex. Cr.App.1979), this Court also found the evidence sufficient to support an affirmative answer to the second punishment issue. Brooks was convicted of capital murder committed in the course of a kidnapping. Brooks and two accomplices decided to go shoplifting but on the way downtown, their car vapor-locked. Needing transportation, Brooks went to a used car lot and asked to test drive a car. Since company policy re-

quired an employee to accompany customers on test drives, the decedent, a mechanic on the lot, accompanied Brooks. Brooks then picked up the accomplices and took the decedent to a motel. After forcing the decedent into a room at gunpoint, Brooks threatened a motel employee with the gun and then returned to his room. Soon after, Brooks killed the decedent. At trial, the State introduced evidence of a prior Louisiana conviction for simple burglary, a prior Texas conviction for theft over $50 and three prior federal convictions for illegal possession of a firearm. This Court held Brooks' repeated criminal actions on the day of the murder, as well as his prior criminal record, supported a finding that Brooks presented a continuing threat of violence. *Id.,* at 323.

In *Russell v. State*, 598 S.W.2d 238 (Tex. Cr.App.1980), this Court again found the evidence supported an affirmative answer to the second punishment issue. Russell kidnapped, sexually abused and murdered the complaining witness in a pending robbery case. At trial for the capital offense, the State presented evidence of Russell's prior criminal record, including, burglary, robbery and assault with intent to murder. Additionally, Russell was on parole when he robbed the decedent. After the robbery, Russell was arrested but released on bond. While on bond, Russell committed the capital murder. This Court held Russell's repeated criminal conduct supported a finding that Russell constituted a continuing threat to society. *Id.,* at 255.

By contrast, in *Roney v. State*, 632 S.W.2d 598, the defendant was sentenced to death for a capital murder committed in the course of an armed robbery. At trial, the State introduced evidence of one extraneous crime, an armed robbery committed shortly before the capital offense. In reforming Roney's sentence to life imprisonment, this Court held:

> ... [The extraneous] robbery was committed only minutes before the primary offense. The two robberies were essentially parts of a one-night crime spree. It does not show a repetition of criminal conduct so much as a single criminal purpose with two successive targets. It does not exhibit

the kind of repeated criminal conduct shown in *Brooks v. State* ... and *Russell v. State* ... relied on by the State, where various prior convictions clearly demonstrated a probability of a continuing threat to society.

*Id.* at 603.

While appellant has only one prior adjudicated offense for unauthorized use of a motor vehicle, a non-violent offense, appellant also has numerous prior unadjudicated offenses which were committed over a span of twenty five days and are violent in nature. These extraneous crimes are undeniably aggravating factors to the instant offense.

While appellant's unadjudicated offenses militate against reforming his sentence, it is noteworthy that all the offenses are confined to a short span of time in appellant's life. This evidence is akin to that in *Ellason* where the defendant "committed eight to ten unadjudicated burglaries" within a month before the commission of the capital offense. *Ellason*, 815 S.W.2d at 660. On the other hand, the evidence of appellant's unadjudicated offenses is unlike Brooks and Russell; appellant's repeated conduct are not the acts of a *career criminal.* While not excusing appellant's conduct, the fact that these crimes are confined to such a brief and unrepresentative period in appellant's life presses in his favor.

## 5. Defendant's Age at the Time of the Offense

In its review, the Court also considers a defendant's age at the time he committed the crime. The defendant's age at the time of the offense is a significant factor towards whether he poses a continuing threat to society. In *Thompson v. Oklahoma*, 487 U.S. 815, 835, 108 S.Ct. 2687, 2698, 101 L.Ed.2d 702 (1988), the Supreme Court endorsed the principle that:

[L]ess culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult ... Inexperience, less education, and less intelligence make the teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is much more apt to be motivated by mere emotion or peer pressure than is an adult. The reasons why juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult.

In *Graham v. Collins*, —— U.S. ——, ——, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993), Justice Souter explained the dual nature of youth as a mitigating factor:

... Youth may be understood to mitigate by reducing a defendant's moral culpability for the crime, for which emotional and cognitive immaturity and inexperience with life render him less responsible ... and *youthfulness may also be seen as mitigating just because it is transitory, indicating that the defendant is less likely to be dangerous in the future.*

*Id.,* —— U.S. at ——, 113 S.Ct. at 924 (Souter, J., dissenting) (citation omitted). *See also, Eddings v. Oklahoma*, 455 U.S. 104, 115–116, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982).

Youth as a mitigating factor is particularly important in capital cases where a sentence of death is imposed. In *Johnson v. Texas*, the Supreme Court approved of our inclusion of youth as a consideration in our review of whether the evidence supports an affirmative finding on the second punishment issue. *Id.,* —— U.S. at ——, 113 S.Ct. at 2671 (citing *Ellason*, 815 S.W.2d at 660, *and, Brasfield*, 600 S.W.2d 288). The Supreme Court emphasized the significance of youth as a relevant mitigating factor to be considered in our capital sentencing scheme:

There is no dispute that a defendant's youth is a relevant mitigating circumstance that must be within the effective reach of a capital sentencing jury if a death sentence is to meet [constitutional] requirements. Our cases recognize that "youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and psychological damage" ... A lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often

result in impetuous and ill-considered actions and decisions. A sentencer in a capital case must be allowed to consider the mitigating qualities of youth in the course of its deliberations over the appropriate sentence.

*Johnson,* —— U.S. at ——, 113 S.Ct. at 2668–2669.

In *Ellason*, this Court acknowledged that while a defendant's age "at the time of offense is insufficient, *standing alone* to prevent imposing the death penalty, *youth by its very nature is a mitigating factor to be noted and considered.*" *Id.,* 815 S.W.2d at 663. As noted above, appellant was nineteen years old when he committed the instant offense. The recklessness and violence of appellant's twenty-five day crime spree is undoubtedly a derivative of his youth. While this, at first glance, appears to be an aggravating circumstance, appellant's reckless violence may be aberrational because *"the signature qualities of youth are transient*; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Johnson,* —— U.S. at ——, 113 S.Ct. at 2669.

Appellant's age at the time he committed the murder falls within a range we have considered to be mitigating. *See, Ellason, Beltran, Huffman,* and *Warren. But see also, Williams.* Moreover, this Court has not limited its consideration of a defendant's youth to his teenage years. In *Huffman,* the Court held the defendant's youth mitigated towards reforming his sentence even though he was twenty-two when he committed the offense. In *Beltran* and *Warren,* the Court considered each defendant's youth despite the fact that each was twenty-five when the offenses were committed. Comparing appellant's case to these other cases, it is notable that appellant was the same age as Ellason, *three years younger* than Huffman, and *six years younger* than Beltran and Warren.

### 6. Influence by Another Party and Intoxication

Whether the defendant was acting under the influence or domination of another at the time the offense is another factor in the Court's review. While my research failed to disclose any prior cases where this Court has found a capital defendant to have acted under the domination of another party, the facts of the instant case clearly show an influence over appellant.

From the testimony of Dr. Brown we are able to conclude that appellant was heavily influenced by Bolden and Bethany. The record reveals a progression of crimes in which appellant *participated* along with Bethany: (a) on November 5th, appellant and an accomplice stole a car at gunpoint from Anthony Jolivet; (b) on November 13, Bolden, Joseph, Bethany and appellant stole a Suburban; (c) later on November 13, Bethany and appellant robbed—and Bethany shot—Zahir Ali as Bolden waited outside in the stolen Suburban; (d) on November 20, after Bolden, Bethany and appellant argued with some boys, appellant shot at the boys, a stray bullet hitting a little girl; (e) later on November 20, after Bolden, Bethany and appellant argued with Jimmy Johnson and Jarrode Turner, appellant shot Johnson and Turner, wounding both; (f) in the evening of November 20, Bolden, Bethany and appellant broke into the Alamo Gun Shop and stole weapons; (g) on November 23, Bethany, an unidentified male, and appellant drove into an apartment complex and fired upon a group of people standing outside; (h) on November 24, appellant and an unidentified male fired upon a group of people standing outside another apartment complex; (i) on November 25, Bethany and appellant burglarized Collector's Firearms; (j) on November 26, Bethany and appellant burglarized Coco Fashions; (k) on November 28, Bethany and appellant entered Royal Gold Jewelry where appellant killed the decedent.

It is not coincidental that appellant's violent offenses arose after associating with Bethany and Bolden. In each instance, appellant committed his crimes in the company of Bethany or Bolden. Dr. Brown attributed appellant's conduct in part to his association with Bethany and Bolden "*I think it's critical that he returned to Houston and became involved with this antisocial group, in other words, accomplices who had criminal intentions.*" While peer pressure does not excuse a defendant's culpability for criminal acts, it

is undeniable that appellant's crimes were influenced by his friends. Consequently, appellant is less blameworthy than if he had initiated and participated in these crimes on his own.

Furthermore, the Court should consider the part that appellant's alcohol consumption played in his commission of the instant offense. There is evidence that appellant was intoxicated at the time of the offense. Dr. Ray testified during the punishment phase that appellant had been drinking prior to the killing and that alcohol lowers impulse control.[4] This Court has held that a defendant's intoxication at the time of the offense may be a mitigating factor with regard to punishment. *See, Tucker v. State,* 771 S.W.2d 523, 534 (Tex.Cr.App.1988).

### 7. Psychiatric Evidence

While psychiatric testimony is not essential to support a finding of a continuing threat, *Rosales v. State,* 841 S.W.2d 368, 382 (Tex. Cr.App.1992), the significance of psychiatric testimony upon a finding of a defendant's propensity to commit future acts of violence cannot be denied. *See, Barefoot v. Estelle,* 463 U.S. 880, 896–903, 103 S.Ct. 3383, 3396–3399, 77 L.Ed.2d 1090 (1983). *See also, Barefoot v. State,* 596 S.W.2d 875, 887 (Tex. Cr.App.1980), *and, Robinson v. State,* 548 S.W.2d 63, 66 (Tex.Cr.App.1977). This Court has found in a number of cases in which favorable psychiatric evidence by the defendant—or an absence of psychiatric evidence by the State—mitigated towards reforming a death sentence.

In *Ellason,* 815 S.W.2d 656, the State failed to present psychological evidence. *Id.,* at 660. By contrast, Ellason presented favorable psychological testimony. Dr. Richard Schmitt, a psychologist, testified that Ellason was an amphetamine addict and his criminal activities were limited to those strictly necessary to supply the drugs required by his addiction. *Id.,* at 663. Further, Dr. Schmitt stated that at the time of

the killing Ellason had been suffering from "amphetamine psychosis" which resulted in his feeling threatened by the environment. *Id.* Finally, Dr. Schmitt opined Ellason could successfully complete a drug-rehabilitation program and once drug-free, would pose no danger to society. *Id.* Dr. Schmitt's testimony was a significant factor in this Court's decision to reform Ellason's death sentence:

> ... Expert testimony established that without drugs the appellant would not be a threat to society, that he is the type of person who would benefit from drug rehabilitation, and that drug treatment programs are available in the penitentiary.

*Id.,* at 664.

In *Huffman,* 746 S.W.2d 212 (Tex.Cr.App. 1988), the defendant, twenty-two years old, strangled the decedent in the course of robbing her. At trial, the State "with the burden of proof, offered no psychiatric or lay opinions as to future dangerousness...." *Id.* at 224. Huffman testified that he came from a broken home and that at the time of the offense he was severely depressed because of a failing relationship. Huffman further stated that prior to the murder he had been using drugs and drinking and that he suffered a "blackout" and could not remember committing the crime. *Id.,* at 216. Dr. Richard Lee Ware, a clinical psychologist, testified on behalf of Huffman. Dr. Ware stated Huffman had a low to average IQ and that individuals like Huffman often resorted to alcohol and drug abuse to avoid confrontation. *Id.* at 217. Dr. Ware further testified that Huffman had a history of alcohol and drug abuse and that it was possible that Huffman's alcohol and drug use on the night of the offense caused a blackout. Dr. Ware concluded it was possible for a person to remember the events of a blackout and that if Huffman remembered, he would feel guilt and remorse for his crime. However, Dr. Ware did not give an opinion on whether Huffman posed a continuing threat. Nevertheless, this Court held the evidence was

---

**4.** *Dr. Ray testified that in the morning of the offense, appellant drank a beer after waking up. Appellant then went to Bethany's house where he and Bethany consumed four 40–ounce beers prior to leaving to go buy a pendant at Royal Gold* Jewelry. Dr. Ray further testified that during her interview with appellant he stated to her that "he believes he's not completely drunk when he did this but his actions were, to some degree, controlled by alcohol but he was not drunk."

insufficient to support an affirmative finding to the second punishment issue. *Id.,* at 225.

In *Beltran,* 728 S.W.2d 382, the State presented evidence that Beltran had a bad reputation as a law-abiding citizen, that he had a series of mostly non-violent prior offenses, and that he was on probation at the time he committed the offense. *Id.,* at 389. However, neither the State nor Beltran offered psychiatric testimony. In reforming Beltran's death sentence, the Court noted the absence of psychiatric evidence presented by the State. *Id.,* at 390.

In *Warren,* 562 S.W.2d 474, in finding the State's evidence insufficient to support an affirmative answer to the second punishment issue, this Court specifically noted that "[t]here was no qualified psychiatric testimony as to appellant's psychiatric makeup, which has been held to have probative value as to special issue No. 2 under Article 37.-071...." *Id.,* at 476 (citations omitted).

Appellant's case is analogous to these cases. In each case, the State failed to present psychiatric testimony to support a finding of a continuing threat. In *Huffman,* while reviewing the evidence, we observed "[t]he State, *with the burden of proof,* offered no psychiatric or lay opinions as to future dangerousness...." *Huffman,* 746 S.W.2d at 224. Here too, the State failed to present psychiatric evidence that would support a finding that appellant would be a continuing threat. The analogy between *Beltran* and the instant case is closer because both cases involve murders committed in the course of an armed robbery. In *Beltran,* as here, the State failed to present psychiatric testimony showing appellant to be a continuing threat. *See, Beltran,* 728 S.W.2d at 389–390. By contrast, appellant, like the defendant in *Ellason,* presented favorable psychiatric testimony which the State failed to rebut. In *Ellason,* Dr. Schmitt testified that appellant would benefit from drug rehabilitation offered in prison and that once drug-free, Ellason would no longer be a danger. *Id.,* 815 S.W.2d at 664. The favorable psychiatric testimony is even more persuasive in the instant case. Dr. Ray's testimony is strikingly similar to Dr. Schmitt's. Dr. Ray testified that appellant would likely benefit from a structured environment and would benefit from the in-patient alcohol treatment programs offered in prison. In addition, both Dr. Ray and Dr. Brown testified that appellant lacked the type of antisocial personality or innate hostility characteristic of violent career criminals. Finally, Dr. Brown expressly concluded that appellant had a good prognosis for rehabilitation.

### 8. Relevant Character Evidence

Finally, any character evidence presented at trial is relevant. Evidence of remorse over the crime is highly probative towards whether a defendant is a future danger because internalized guilt is a strong deterrent from continuing criminal behavior. *See, Williams,* 668 S.W.2d at 696. *Compare, Huffman,* 746 S.W.2d at 217. In *Williams,* we held that the defendant's expressions of remorse were self-serving and unbelievable. *Id.,* 668 S.W.2d at 696. By contrast, there is overwhelming testimony in this case indicating appellant's sincere remorse over the killing. Appellant wrote a letter to the decedent's family expressing his regrets about the killing. Dr. Brown testified appellant had expressed to him remorse about the killing and was often plagued by guilt. Dr. Ray testified that appellant had expressed remorse about the killing. Burrell, testified that during prayer sessions, appellant often cried and expressed remorse about the killing. Finally, Soodjai Wilkerson, testified that appellant expressed his sorrow over the killing and begged her forgiveness. Unlike *Williams,* we find these numerous expressions of regret and sorrow to be persuasive that appellant is repentant for his crime.

Moreover, appellant presented other character evidence indicating that he was rehabilitatable. Dr. Ray testified that appellant had voluntarily discontinued using drugs years prior to the instant offense. Appellant recognized his alcoholism and attended A.A. meetings in jail. Additionally, appellant presented evidence that he worked while attending school and attempted to join the Marine Corps upon turning eighteen. This evidence suggests that appellant has a sense of personal responsibility, further indicating that appellant may be rehabilitatable.

A review of the *Keeton* factors, reveals that seven of the eight factors militate towards reforming appellant's death sentence. Moreover, the sole factor which militates towards a death sentence, appellant's crime spree, is misleading because the brief and sudden nature of the spree is unrepresentative of appellant's life. Yet, rather than address the evidence as it relates to the relevant factors, the majority summarily dismisses or ignores evidence challenging the affirmative answer to the second punishment issue. *See,* Majority Op. pg. 325. In effect, the majority chooses to ignore the cumulative weight of the evidence mitigating towards reforming appellant's sentence from death to life imprisonment. Nonetheless, when examined as a whole, the weight of the evidence suggests that appellant has a reasonable chance of rehabilitation and is probably *not* a *continuing* threat to society. Consequently, a rational jury could not have affirmatively answered the second punishment issue beyond a reasonable doubt. Therefore, to affirm appellant's sentence would be to "wantonly" and "freakishly" impose a death sentence, in violation of the United States Constitution. *See, Jurek,* 428 U.S. at 276, 96 S.Ct. at 2958, *and, Keeton,* 724 S.W.2d at 64.

With the foregoing comments, I respectfully dissent to the majority's failure to reform appellant's sentence from death to life imprisonment.