Opinion issued July 3, 2003













In The
Court of Appeals
For The
First District of Texas




NO. 01-01-01233-CR




LESLIE JONES, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 179th District Court
Harris County, Texas
Trial Court Cause No. 854,071




MEMORANDUM OPINION

          Appellant, Leslie Jones, killed Charles Keith Mueller by striking him on the
head with a baseball bat. Appellant claimed that he killed Mueller in self-defense. 
The jury rejected this claim, convicted appellant of murder, and assessed punishment
at 99 years’ confinement. We address (1) the legal and factual sufficiency of the
evidence to support the jury’s finding that appellant committed murder and to support
the jury’s implicit finding rejecting appellant’s self-defense claim, and (2) whether
the trial court erred in making an affirmative deadly weapon finding in the judgment.
          We modify the trial court’s judgment and, as modified, affirm.
Background
          It is undisputed that appellant killed Mueller on August 19, 2000. The State
and the defense presented different versions of the events leading up to the killing. 
The State presented evidence portraying the incident as an intentional and brutal
murder. The defense argued that the killing occurred in self-defense during a fight
between appellant and Mueller. 
          Keisha Narinsenga testified for the State. We summarize her testimony as
follows. 
          Narinsenga met appellant two or three weeks before he killed Mueller. During
that time, Narinsenga and appellant developed a sexual relationship. 
          Narinsenga met Mueller about one month before he was killed. At the time of
his death, Narinsenga was staying at Mueller’s home. A couple of days before
Mueller’s death, Narinsenga and Mueller had an argument. During that argument,
Mueller made advances toward Narinsenga, which she construed as an attempted
sexual assault. Following the argument, Narinsenga decided that she would leave
Mueller’s home. She called appellant to pick her up. Narinsenga told appellant that
Mueller had tried to rape her. When he arrived at Mueller’s home, appellant told
Narinsenga that he did not have room in his car for her belongings. He stated that
they would have to come back later to Mueller’s home. Mueller was not at home at
the time. 
          The next day, Saturday, August 19, 2000, appellant drove Narinsenga back to
Mueller’s house to pick up her belongings. When appellant and Narinsenga pulled
up to Mueller’s house, Mueller was outside in the yard. Narinsenga told Mueller that
she was there to pick up her belongings. Mueller responded, “Well, hurry up and
come get your shit.” Narinsenga went into Mueller’s house to the bedroom to gather
her belongings, which were in bags. Mueller carried the bags to the driveway. 
Appellant then took the bags from the driveway and placed them in his car. 
          Narinsenga was on the phone when she noticed appellant in the house. She
was surprised to see appellant because she had removed all of her bags from the
house. Appellant asked Narinsenga if she had all of her things, and she told appellant
that she did. Appellant said, “Leave something.” Appellant then left the house. As
Narinsenga was leaving, she passed by a closet, which was next to the front door. 
She remembered that she had left some shoes wrapped in a blanket in the closet. 
          After Narinsenga finished gathering her shoes, she was leaving the house when
she saw appellant walking toward the garage with a baseball bat. Although appellant
had been wearing a Hawaiian shirt, Narinsenga also noticed that he had removed it
and was wearing only his undershirt and shorts. Narinsenga then noticed Mueller
next to her. Mueller asked appellant why he was acting “like a bitch.” Narinsenga
then noticed that Mueller had a hammer in his hand, down at his side. Appellant then
tackled Mueller. Appellant had his arms around Mueller with his head against
Mueller’s stomach. Appellant was using his head to push Mueller into different
objects. Narinsenga saw appellant “slam” Mueller into the fireplace and wall. 
Narinsenga was screaming for the men “to stop,” but they continued to struggle. 
During the struggle, appellant dropped the bat and Narinsenga grabbed it. As she was
leaving the house through the garage, Narinsenga saw appellant fall on top of
Mueller. It appeared that Mueller had hit himself in the head with the hammer, and
that appellant’s head might have struck something when he fell on top of Mueller. 
Although Mueller was still holding the hammer, Narinsenga never saw him strike or
attempt to strike appellant with it. When Narinsenga last saw Mueller, he was lying
on the living room floor. Narinsenga observed that Mueller had a “big red knot” on
his forehead, but saw no blood. With the baseball bat still in her hand, Narinsenga
tried to “run for it.” As Narinsenga was leaving, appellant approached her and
attempted to take the bat. Although she resisted, appellant took the bat from
Narinsenga. Appellant told Narinsenga to wait in the car, and she complied. 
Appellant returned to the house with the bat and shut the garage door. While waiting
in appellant’s car, Narinsenga heard “fighting” noises coming from the house. 
          Appellant had been in the house three or four minutes when he returned to the 
car carrying the bat. Appellant threw the bat into the backseat. His undershirt was
ripped and had blood on it. Appellant had scratches on his arms and neck. Appellant
got into the car and told Narinsenga, “I killed that bitch.” Narinsenga looked at the
bat in the backseat and saw blood on it. Appellant told Narinsenga to say that
someone else had been at Mueller’s home before he and Narinsenga had arrived.
          Appellant and Narinsenga drove to the house of appellant’s friend. Appellant
discarded the bat in a trash can behind the friend’s house.
          Assistant medical examiner Dr. Paul Shrode also testified for the State. Dr.
Shrode performed Mueller’s autopsy. He concluded that the cause of Mueller’s death
was “blunt multiple impact cranial facial trauma.” Dr. Shrode testified that Mueller
had three deep facial lacerations, one of which fractured Mueller’s skull to the extent
that the brain was visible through the fracture. He described numerous other fractures
to Mueller’s skull and facial bones. Mueller’s chest and abdomen had “cylindrical”
bruises that Dr. Shrode stated were consistent with injury inflicted by a baseball bat. 
According to Dr. Shrode, Mueller had been struck 12 to 15 times, with at least four
blows to the head.
          Dr. Shrode stated that the toxicology analysis performed as part of the autopsy
indicated the presence of alcohol and cocaine in Mueller’s system. The analysis also
revealed “marijuana metabolite,” which, according to Dr. Shrode, indicated that
Mueller had used marijuana a day or two prior to his death.
          The State also offered the testimony of several investigating police officers. 
The officers testified that the condition of Mueller’s home showed obvious signs of
a struggle. 
          Detective Mark Schmidt of the Harris County Sheriff Department’s Homicide
Division testified that appellant was arrested on August 28, 2000. Detective Schmidt
stated that appellant had scratches on his arms, shoulder, and nose at the time of his
arrest.
          The State’s DNA experts testified that Mueller’s blood was found in
appellant’s car. A police blood-spatter expert testified that Mueller’s blood was
found on the walls and ceiling of his home. The expert opined that Mueller was less
than two feet from the floor when his wounds were made.
          Appellant testified at trial. Appellant admitted hitting Mueller with the
baseball bat “a couple of times.” Appellant’s version of the events surrounding
Mueller’s death differed from that given by Narinsenga in the following pertinent
respects:
•Appellant denied that he had gone with Narinsenga to Mueller’s
home on August 18, the day before Mueller was killed, when
Mueller was not home. Appellant also denied telling Narinsenga
during that visit that he had no room in his car for her belongings,
and that they would have to return another time. 
 
•Appellant denied that Narinsenga told him that Mueller had
attempted to rape her. 
 
•Appellant claimed that Mueller was the aggressor. Appellant
testified that he was helping Narinsenga gather her shoes from the
closet when Mueller attacked him. Appellant stated that Mueller
swung the hammer wildly at him. Appellant testified that he
grabbed the hammer and began struggling with Mueller.
 
•Appellant denied that he had retrieved a baseball bat from his car. 
He claimed that, during the struggle, he grabbed the bat from “the
doorway of the closet.” 
 
•Appellant stated that he never removed his shirt.
 
•Appellant denied that he told Narinsenga, “I killed the bitch,”
when he returned to the car. 
          At trial, appellant described the events that immediately preceded the acts that
led to Mueller’s death. Appellant testified that, during the struggle, he and Mueller
fell to the floor. Appellant stated that he “blanked out for a second.” When appellant
awoke, he saw Mueller attempting to get up. At that point, appellant stated that he
grabbed the baseball bat from the closet. Expounding on this point, appellant
testified as follows:
[Defense counsel]: When you picked up the baseball bat, why did you
hit [Mueller]?
 
A. He appeared to me [sic] that he was getting up, like he wanted to
come back after me.
 
Q. So why did you hit him?
 
A. I didn’t want him to get up and hit me or hit me with the hammer.
 
Q. The door to the house, do you know whether or not the front door .
. . was open or closed at that point?
 
A. No, sir, I’m not sure if it was open or closed.
 
Q. Why didn’t you just get up and run away?
 
A. Because he was getting up. I’m not sure was he going to hit me
when I turn my back to him or not. I’m not sure was he going to hit me
when I turn around and try to run. I’m not sure.
 
Q. Did you intend to kill [Mueller] when you hit him with that baseball
bat?
 
A. No, sir. I just wanted to get him off me so I can get away, basically
just to leave me alone, to stop coming after me.
Discussion
A.      Sufficiency of the Evidence
          In his first six issues, appellant challenges the legal and factual sufficiency of
the evidence to support his conviction. In issues one through four, appellant
complains that the evidence was legally and factually insufficient to prove the mens
rea element of murder. In issues five and six, appellant contends that the evidence
was legally and factually insufficient to support the jury’s implicit finding that
appellant did not kill Mueller in self-defense. 
          1.       Sufficiency of the Evidence: Murder
          In two separate paragraphs, the indictment charged appellant with murder
under subsections 19.02(b)(1) and 19.02(b)(2) of the Penal Code. Under these
subsections, a person commits the offense of murder if he intentionally or knowingly
causes another’s death or “intends to cause serious bodily injury and commits an act
clearly dangerous to human life that causes the death of an individual.” Tex. Pen.
Code Ann. § 19.02(b)(1),(2) (Vernon 2003). The jury returned a verdict finding
appellant “guilty of murder, as charged in the indictment.”


 Appellant contends that
the evidence was legally and factually insufficient to establish that he acted with the
requisite intent or knowledge.
          A person acts intentionally with respect to the result of his conduct when it is
his conscious objective or desire to cause the result; he acts knowingly when he is
aware that his conduct is reasonably certain to cause the result. Id. § 6.03(a),(b)
(Vernon 2003). The accused’s mental state is a question of fact for the jury to
ascertain, usually from circumstantial evidence, whether the accused intentionally or
knowingly caused a person’s death or intended to cause that person serious bodily
injury. See Manrique v. State, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers,
J., concurring) (citing Robles v. State, 664 S.W.2d 91, 94 (Tex. Crim. App. 1984));
Childs v. State, 21 S.W.3d 631, 635 (Tex. App.—Houston [14th Dist.] 2000, pet.
ref’d). A jury may infer intent or knowledge from facts that tend to prove its
existence, including the acts, words, and conduct of the accused, the method of
committing the crime, and from the nature of the wounds inflicted on the victim. 
Hernandez v. State, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991) (acts, words, and
conduct); Cordova v. State, 698 S.W.2d 107, 112 (Tex. Crim. App. 1985) (methods
and wounds). 
          In a legal-sufficiency review, we view the evidence in the light most favorable
to the verdict to determine whether a rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt. King v. State, 29 S.W.3d
556, 562 (Tex. Crim. App. 2000). The standard is the same for both direct and
circumstantial evidence. Sutherlin v. State, 682 S.W.2d 546, 549 (Tex. Crim. App.
1984). In determining the legal sufficiency of the evidence to show appellant’s
intent, and when faced with a record that supports conflicting inferences, we “must
presume—even if it does not affirmatively appear in the record—that the trier of fact
resolved any such conflict in favor of the prosecution, and must defer to that
resolution.” Matson v. State, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).
          The evidence, viewed in the light most favorable to the verdict, shows that 
Narinsenga told appellant, a man with whom she had a sexual relationship, that
Mueller had attempted to rape her. Appellant and Narinsenga went to Mueller’s
home the day before Mueller was killed to pick up Narinsenga’s belongings. Mueller
was not home at the time. Appellant told Narinsenga that they would have to return
another time. Appellant and Narinsenga returned to Mueller’s residence the
following day, which was a Saturday. Mueller was at home when they returned. 
          As Narinsenga finished gathering her belongings, appellant walked into
Mueller’s home with a baseball bat. Appellant had removed his shirt and was
wearing only his undershirt and shorts. Appellant tackled Mueller and began pushing
him into objects. Narinsenga grabbed the bat and tried to leave with it. Appellant
came after Narinsenga and took the bat away from her. Appellant told Narinsenga
to go to the car. Appellant went back into the house with the bat. Appellant admits
to striking Mueller with the bat. Appellant returned to the car several minutes later
with the bloody bat and said, “I killed the bitch.” Appellant told Narinsenga to say
that someone else had been at Mueller’s house before they had arrived.
          The extent and type of Mueller’s wounds are also probative evidence of
appellant’s intent. Mueller had three deep facial lacerations and numerous facial and
skull fractures. Appellant hit Mueller in the head with such force that Mueller’s skull
was cracked, exposing Mueller’s brain. Mueller had been dealt 12 to 15 blows,
including at least four blows to the head. 
          The State’s forensic evidence showed that, although Mueller was no more than
two feet from the floor when he was struck, appellant hit Mueller hard enough to
cause Mueller’s blood to spatter on the walls and ceiling of his home. 
          We conclude that the State’s evidence of appellant’s culpable mental state was
such that a reasonable juror could have found either (1) that appellant intentionally
or knowingly caused Mueller’s death or (2) that appellant intended to cause serious
bodily injury to Mueller and committed an act clearly dangerous to human life that
caused Mueller’s death. Viewing the evidence in the light most favorable to the
verdict, we hold the evidence to be legally sufficient. 
          We next turn to the factual sufficiency of the evidence. In a factual-sufficiency
review, we examine all of the evidence neutrally and ask whether proof of guilt is so
obviously weak as to undermine confidence in the jury’s determination or so greatly
outweighed by contrary proof as to indicate that a manifest injustice has occurred. 
See Zuliani v. State, 97 S.W.3d 589, 593-94 (Tex. Crim. App. 2003). We review the
evidence weighed by the jury that tends to prove the existence of the elemental fact
in dispute and compare it with the evidence that tends to disprove that fact. Jones v.
State, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). But we must avoid substituting
our judgment for that of the factfinder. Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim.
App. 2000). The factfinder is the sole judge of the weight and credibility of witness
testimony. Id. 
          In our review, we must consider the most important evidence that the appellant
claims undermines the jury’s verdict. Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim.
App. 2003). In this regard, appellant cites the following evidence:
          •        Appellant’s testimony that, when he and Narinsenga arrived at Mueller’s
residence on August 19, Mueller told Narinsenga, “Go get your fucking
clothes bitch.”
 
          •        Appellant’s testimony that he was helping Narinsenga gather her shoes,
when Mueller appeared with the hammer in his hand; appellant had
nothing in his hands.
 
          •        Appellant’s testimony that Mueller swung at him with the hammer.
 
          •        Appellant’s testimony that he grabbed the hammer and that he and
Mueller began struggling throughout the house.
 
          •        Appellant’s and Narinsenga’s testimony that Mueller hit himself in the
head with the hammer.
 
          •        Appellant’s testimony that, after he and Mueller fell to the floor,
appellant “blanked out” for a short time. 
 
          •        Appellant’s testimony that, because he thought Mueller was about to
attack him, he grabbed the bat from the closet and hit Mueller with it.
 
          •        Narinsenga’s testimony indicating her uncertainty as to whether
appellant had the bat first, or whether Mueller had the hammer first.
 
          •        Narinsenga’s testimony that she never saw the bat in appellant’s car
before he used it to kill Mueller.
 
          •        Dr. Shrode’s testimony that the toxicology report associated with
Mueller’s autopsy showed that Mueller was under the influence of drugs
and alcohol at the time he was killed.
 
          •        Dr. Shrode’s inability to state what type of behavior Mueller would have
displayed while under the influence of the drugs detected in his system.
 
          •        Dr. Shrode’s testimony that he could not state conclusively that a
baseball bat caused Mueller’s injuries.
 
          •        Appellant’s testimony that he did not intend to kill Mueller.
 
          Appellant contends that the above-cited evidence disproves the requisite
element of intent. Appellant claims that a comparison of the evidence that proves
appellant possessed the requisite culpable mental state with the above-cited evidence
shows that the evidence was factually insufficient to support the jury’s verdict. We
disagree. 
          Much of the evidence cited by appellant, as set out above, supports his
defensive theory that appellant struck Mueller to protect himself from Mueller’s
attack. However, as discussed under our legal-sufficiency review, ample evidence
exists in the record to support the State’s theory that appellant attacked Mueller and
then intentionally killed him. In this regard, Narinsenga’s testimony was critical to
the State’s theory of the case. To the extent that Narinsenga’s account of the events
preceding Mueller’s death directly contradicted the account offered by appellant, it
was for the jury to resolve these factual disputes. See Johnson, 23 S.W.3d at 7. As
the factfinder, the jury was free to believe Narinsenga and disbelieve appellant. The
jury was equally as free to disbelieve appellant’s statement that he did not intend to
kill Mueller.
          In addition to his own testimony, appellant also relies on portions of
Narinsenga’s testimony to support his factual-sufficiency challenge. However, in
doing so, appellant takes Narinsenga’s testimony out of the context of Narinsenga’s
other testimony. Although Narinsenga testified that she did not see a bat in
appellant’s car before Mueller was killed, Narinsenga also testified that she saw
appellant carrying the bat before the killing, as he walked toward Mueller’s garage. 
Appellant correctly points out that Narinsenga testified that she did not know whether
appellant had the bat first or whether Mueller had the hammer first; however,
Narinsenga also testified that she saw appellant with the bat before she saw Mueller
with the hammer.
          Further, when viewed neutrally, the evidence showing that Mueller was under
the influence of alcohol and controlled substances when he was killed could support
either the defense’s or the State’s theory of the case. The jury could have inferred
that, while under the influence of these substances, Mueller became belligerent and
attacked appellant, or the jury could have reasonably concluded that Mueller’s
condition made him more vulnerable to appellant’s attack. 
          We conclude that the State’s proof of appellant’s culpable mental state is not
so obviously weak that it undermines confidence in the jury’s verdict; neither is the
State’s proof greatly outweighed by contrary proof. See Zuliani, 97 S.W.3d at 593-94. Viewing all of the evidence in a neutral light, we hold the evidence to be
factually sufficient.
          We overrule appellant’s issues one, two, three, and four.
          2.       Sufficiency of the Evidence: Self-defense
          In issues five and six, appellant contends the evidence was legally and factually
insufficient to defeat his theory of self-defense. 
          A person is justified in using force against another when and to the degree he
reasonably believes the force is immediately necessary to protect himself against the
other’s use or attempted use of unlawful force. Tex. Pen. Code Ann. § 9.31 (Vernon
2003). To justify deadly force in self-defense, the actor must show, among other
things, that (1) a reasonable person in the actor’s situation would not have retreated,
and (2) the actor reasonably believed that the deadly force was immediately necessary
to protect himself against the other’s use or attempted use of deadly force. Tex. Pen.
Code Ann § 9.32 (Vernon 2003).
          The State has the burden of persuasion in disproving evidence of self-defense
once the issue is raised. Saxton v. State, 804 S.W.2d 910, 913 (Tex. Crim. App.
1991); Wilkerson v. State, 920 S.W.2d 404, 406 (Tex. App.—Houston [1st Dist.]
1996, no pet.). This is not a burden of production, i.e., one that requires the State
affirmatively to produce evidence refuting the self-defense claim; rather, it is a burden
that requires the State to prove its case beyond a reasonable doubt. Saxton, 804
S.W.2d at 913-914; Wilkerson, 920 S.W.2d at 406. 
          The reasonableness of an accused’s belief that force was required to defend
himself is viewed from the defendant’s standpoint at the time he acted. Juarez v.
State, 886 S.W.2d 511, 514 (Tex. App.—Houston [1st Dist.] 1994, pet. ref’d). The
issue of self-defense is a fact issue to be determined by the jury, and a jury is free to
accept or reject the defensive issue, even if the evidence is uncontroverted. Wilkerson
v. State, 881 S.W.2d 321, 324 (Tex. Crim. App. 1994); Adelman v. State, 828 S.W.2d
418, 421 (Tex. Crim. App. 1992). 
          If the issue of the existence of self-defense is raised by the evidence, the jury
shall be instructed that a reasonable doubt on the issue of self-defense mandates
acquittal.


 Tex. Pen. Code Ann.§ 2.03(d) (Vernon 2003). A jury verdict of guilty
is an implicit finding rejecting the defendant’s self-defense theory. Saxton, 804
S.W.2d at 914. 
          When a defendant challenges the legal sufficiency to support the rejection of
a defense, we examine all of the evidence in the light most favorable to the verdict
to determine whether any rational trier of fact could have found the essential elements
of the offense beyond a reasonable doubt and also could have found against the
appellant on the self-defense issue beyond a reasonable doubt. Id. A factual-sufficiency challenge to a rejection of a defense requires us to review all of the
evidence in a neutral light and to ask whether the State’s evidence, if taken alone, is
too weak to support the jury’s rejection of the defensive theory, and also whether the
proof supporting rejection of the defense, although adequate if taken alone, is against
the great weight and preponderance of the evidence. Zuliani, 97 S.W.3d at 594-95.
          Appellant concedes that he killed Mueller. And, as discussed above, we have
found that the evidence offered to prove appellant possessed the requisite culpable
mental state was legally and factually sufficient to support the jury’s verdict. We,
likewise, reject appellant’s legal and factual insufficiency complaints relating to his
self-defense claim. 
          When a jury’s determination depends primarily on its evaluation of the
witnesses’ demeanor and credibility, it is entitled to almost total deference. Johnson,
23 S.W.3d at 8-9. The jury’s evaluation of the credibility of appellant and Narinsenga
was crucial to its verdict. As discussed above, the jury was free to reject appellant’s
claim that (1) Mueller attacked him, (2) appellant retrieved the baseball bat from the
closet, (3) appellant could not retreat, and (4) appellant feared that Mueller was about
to get up from the floor and strike appellant with the hammer. The jury was equally
entitled to believe Narinsenga’s account of the events leading up to Mueller’s death,
including that (1) appellant attacked Mueller, (2) Narinsenga never saw Mueller
swing the hammer at appellant, (3) appellant entered the house carrying the baseball
bat, (4) appellant grabbed the bat from Narinsenga when she was attempting to leave
the house with it, (5) appellant told Narinsenga to go to the car, (6) appellant went
back into the house with the bat, and (7) appellant came back to the car three or four
minutes later with a bloody bat and undershirt and announced, “I killed that bitch.”
          We note that evidence exists in the record, other than appellant’s own
testimony, that could be interpreted to support appellant’s self-defense theory. It is
undisputed that Mueller had a hammer in his hand during his struggle with appellant. 
But appellant admitted that Mueller never hit him with the hammer. Appellant also
admitted that, when he grabbed the bat and hit Mueller with it, he did not know
whether Mueller had the hammer in his hand. 
          It is also undisputed that Mueller was under the influence of drugs and alcohol
when he was killed. The evidence showed that Mueller was acting strangely when
appellant and Narinsenga arrived at his house. Narinsenga testified that Mueller was
in the yard talking to himself when they arrived. Although this evidence could be
interpreted to support appellant’s self-defense claim, the jury could also have
reasonably concluded from this evidence that Mueller was less physically able to pose
a threat to appellant.
          Other record evidence also weighs against appellant’s self-defense theory. The
evidence showed that while Mueller had facial and skull fractures, appellant had only
scratches. The medical examiner stated that Mueller had been dealt 12 to 15 blows,
with at least four blows to the head. Appellant struck Mueller hard enough to crack
open his skull and for Mueller’s blood to spatter on the walls and ceiling. The State’s
blood-spatter expert testified that Mueller was no more than two feet from the floor
when he was struck. 
          Applying the applicable standards of review and giving due deference to the
factfinder’s determinations, we hold that the evidence was both legally and factually
sufficient to support the essential elements of the offense and the jury’s implicit
rejection of appellant’s claim of self-defense. Accordingly, we overrule issues five
and six.
B.      Affirmative Deadly-Weapon Finding
          In issue seven, appellant complains that the trial court erred by entering an
affirmative deadly-weapon finding in the judgment. We agree.
          The jury can make an affirmative deadly-weapon finding in three ways: (1) by
finding the defendant guilty as charged in the indictment if the indictment alleges use
of a “deadly weapon”; (2) by finding the defendant guilty as charged in the indictment
if the indictment names a weapon that is a deadly weapon per se; or (3) by making an
affirmative finding to a special issue on use of a deadly weapon. Polk v. State, 693
S.W.2d 391, 396 (Tex. Crim. App. 1985). 
          Here, the jury did not make an affirmative deadly-weapon finding by any of the
three means specified in Polk. The indictment charged that appellant caused
Mueller’s death by striking him with an unknown object. Although the jury found
appellant “guilty of murder, as charged in the indictment,” the indictment did not use
the nomenclature “deadly weapon” and did not name a weapon that is a deadly
weapon per se. The jury was not asked to answer a special issue on use of a deadly
weapon. 
          The State argues that, because the indictment alleged Mueller’s death was
caused by appellant’s striking Mueller with an unknown object, that unknown object
is a deadly weapon. In its brief, the State wrote, “By finding appellant guilty as
charged in the indictment, the jury necessarily made an affirmative finding of a
deadly weapon.” In other words, the State contends that the deadly weapon finding
can be implied; however, basing an affirmative deadly weapon in a judgment on an
“implied” finding by the jury was explicitly considered and rejected by the Polk court. 
See id. The court held that, when the jury is the trier of fact at both the guilt and
punishment phases, the deadly weapon finding must be an “express determination
that a deadly weapon or firearm was actually used or exhibited during the commission
of the offense.” Id. at 393. An “implied” deadly-weapon finding will not suffice. Id.
at 396. The Court of Criminal Appeals, in Lafleur v. State, recently reaffirmed its
holding in Polk that there must be an express finding of a deadly weapon when the
jury is the factfinder. No. 1447-02, slip op. at 2 (Tex. Crim. App. May 21, 2003).
          The State writes in its brief that it “recognizes it is asking this Court to find an
exception” to Polk. The case law does not support such an exception. Because the
jury made no express determination that appellant used a deadly weapon to murder
Mueller, we hold that the trial court erred in entering an affirmative deadly weapon
finding in the judgment. We further hold that such error was harmful. See Edwards
v. State, 21 S.W.3d 625, 627 (Tex. App.—Waco 2000, no pet.) (holding, in murder
case, that erroneous deadly-weapon finding was harmful error warranting judgment
to be modified deleting deadly-weapon finding); Rachuig v. State, 972 S.W.2d 170,
179 (Tex. App.—Waco 1998, pet. ref’d) (holding trial court’s error in entering
deadly-weapon finding in judgment was harmful to appellant because appellate court
could not “presume to know the effect this improper finding might have on [the
appellant’s] parole eligibility under the guidelines established by the Board of
Pardons and Paroles” and Texas Code of Criminal Procedure article 37.12 requires
the trial court to enter “the proper judgment”).
          Accordingly, we sustain issue seven and modify the judgment to delete the
deadly-weapon finding.



Conclusion
          As modified, we affirm the judgment of the trial court.




                                                             Laura Carter Higley
                                                             Justice

Panel consists of Chief Justice Radack and Justices Alcala and Higley.

Do not publish. Tex. R. App. P. 47.2(b).