In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-19-00359-CR
_____

FELIX GUILLORY, Appellant

V.

THE STATE OF TEXAS, Appellee

**On Appeal from the 128th District Court
Orange County, Texas
Trial Cause No. A170559-R**

## MEMORANDUM OPINION

A grand jury indicted Appellant Felix Guillory for "intentionally or knowingly caus[ing] the death of . . . Shane Cooper, by cutting and stabbing [him] with a knife or other sharp instrument[.]" *See* Tex. Penal Code Ann. § 19.02(b)(1). Guillory pleaded "not guilty," and a jury found Guillory guilty of murder. The trial court assessed punishment at sixty years of prison. Guillory timely appealed. In one appellate issue, Guillory challenges the legal sufficiency of the evidence supporting his conviction. We affirm.

Evidence at Trial

On March 24, 2016, around 2:30 a.m., law enforcement received a call about a disturbance in the city of Orange on North Street and arrived to find a deceased white male covered in blood, lying on the ground near the passenger side of a Chevrolet Blazer. The deceased, later identified as Shane Cooper, had several apparent lacerations to his neck and appeared to have been in a fight. On the roadway behind the vehicle, the officers observed what appeared to be a silver wedding band, which Shane's wife later identified as Shane's silver wedding ring. The interior of the vehicle had a large amount of blood in it, and the officers found a pocketknife inside the vehicle near the center console. Blood samples were received and analyzed by analysts with the DPS crime lab from the silver wedding ring and the pocketknife discovered inside the victim's vehicle. The DNA analysis showed two contributors: Shane Cooper and Felix Guillory. The cause of death was multiple stab and incised wounds.

Testimony of Officer Isaac Henry

Officer Isaac Henry with the City of Orange Police Department testified that he was on patrol in Orange County on March 24, 2016, and he was dispatched around 2:30 a.m. to the 600 block of North Street for a disturbance call. According to Officer Henry, when he and the other officers arrived, there was a black Chevrolet Blazer parked in the 500 block of North Street with its engine off, headlights illuminated,

with the driver's side door open. On the passenger side of the vehicle, they observed a deceased white male, later identified as Shane Cooper, lying face down with a large amount of blood on and around his body. Officer Henry testified that while he was waiting for first responders to arrive, he observed a glass jar with blood on it on the ground near the rear driver's side of the vehicle under the driver's side open door and a silver ring on the ground a couple of feet from the rear of the vehicle. Officer Henry testified that "[t]here was a lot of blood throughout the vehicle" and blood was on the ground underneath the vehicle and on the vehicle's driver's side doorframe. According to Officer Henry, the vehicle was an easily recognizable older model Blazer, and he had seen Shane in it previously. A twenty-dollar bill, a wrench, and Shane's wallet were retrieved from his pockets. Photographs of the scene were admitted into evidence and published to the jury.

Testimony of Captain Weldon Smith

Patrol Captain Weldon Smith with the City of Orange Police Department testified that on that morning the responding officers requested his assistance once on the scene and he arrived around five minutes later. According to Captain Smith, he saw Mr. Bowens, who had called 911, across the street at the door of his residence. Shane, the deceased, was lying face down on the ground near the Blazer. According to Smith, it appeared that the incident had transpired within a few minutes of his arrival, and he agreed that it appeared as if maybe someone left the body and

3

just ran off. Captain Smith testified that he notified the Homicide Investigation Team to respond and help at the scene and notified the justice of the peace. Captain Smith testified he had the vehicle taken to the police department and had dispatch call area emergency rooms because there was a large amount of blood on the scene and someone else could have been involved and sought medical care.

Testimony of Detective Howard DeVault

Detective Sergeant Howard DeVault with the City of Orange Police Department testified that he was dispatched to the scene for a homicide. DeVault testified that when he arrived, Lieutenant Ashworth was in charge and advised DeVault that the vehicle at the scene was going to be taken to the police station and DeVault was to follow the vehicle until it arrived at the secured area. According to DeVault, from the time he arrived at the scene until the vehicle was placed in the secured area, the vehicle was not tampered with.

DeVault testified he was also present with other officers who conducted interviews in connection with the case. One of those interviews was with Quincy Solomon at Quincy's house, and that is when a folding knife with approximately a two-and-a-half-inch blade was located and placed into evidence. DeVault testified he did not assist with the interview and that he did not know whether the knife was sent to the crime lab.

Testimony of Sergeant Kelly Griffin

Sergeant Kelly Griffin with the City of Orange Police Department was dispatched to the scene, marked evidence, and took measurements and photographs at the scene. Griffin collected a man's silver ring, sealed it in an evidence bag, transported it to the property room at the police station, and it was sent off for testing. A mason jar was also collected from the scene, but law enforcement was unable to successfully obtain fingerprints from it. A hat and a screwdriver were also located at the scene.

Sergeant Griffin picked up a blood spot card from Shane's autopsy that was prepared by the coroner for purposes of matching DNA and transported it to the City of Orange Police Department and then to the Jefferson County crime lab. Sergeant Griffin swabbed a puddle of blood beside the truck and blood from the inside of the driver's door, and the inside and outside of the passenger door.

Testimony of Detective Joseph Steele

Detective Joseph Steele with the City of Orange Police Department was dispatched to the scene to assist in the investigation and became the lead detective on the case. Steele testified that when he arrived, he observed a deceased white male, identified as Shane Cooper, covered in blood and with a "bunch of injuries[]" and "apparent lacerations to his neck." Steele testified that he knew Shane prior to seeing him at the scene, and that a baseball cap recovered at the scene was a hat or cap that

5

Steele recognized because he had seen Shane wearing it prior to that day. According to Steele, there was blood inside the Chevrolet Blazer at the scene and blood splatter "thrown everywhere[,]" included on some garbage cans nearby, and "it looked like [Shane] had been in a fight." Steele testified that in his opinion based on his observations of the scene, a fight started inside the vehicle, and the "bad, horrific fight [] continued down the road until that vehicle stopped[,] and[] then[] Shane Cooper and Mr. Guillory got out and continued to fight outside of that vehicle until Shane bled out and died." Detective Steele explained that based on statements he took and blood on the doorsill he believed Shane was driving, and based on the lack of blood splatter between where the hat was recovered and where the car ended up, he believed Shane's hat was knocked out while he was sitting in the car with the windows down, the fight started inside the vehicle, and the fight continued while the vehicle continued to the place it was found at the scene. According to Detective Steele, there was blood outside of the driver's side of the vehicle because he believed Shane got out to continue to defend himself and was already bleeding, and there was blood on the inside of the passenger side because "if he's bleeding bad enough and he's fighting with the passenger, there's probably blood going both ways." Detective Steele agreed that one possibility explaining the pool of blood on the inside of the passenger side was that after Shane was killed the suspect tried to put him on the passenger side to transport him and drive off but was physically unable to or could

6

not do it before law enforcement arrived. Detective Steele also agreed that with the number of lacerations on Shane's neck and the kind of injuries he sustained he could not have fought anybody for any significant amount of time.

Detective Steele testified that the investigation took about eighteen months to complete and approximately seven to twelve people were interviewed. Detective Steele explained at trial that interviewing people enabled law enforcement to establish a timeline for Shane that night and who he was with. Detective Steele testified that he spoke to people who had seen Shane with Felix Guillory shortly before his death. Detective Steele testified that he spoke with Deanna Cooper, Lawrence Brooks, Felix Guillory, James Guillory, Evelyn Mayorga, Virgie Melancon, and Romon Jones. According to Detective Steele, the information from the interviews and the DPS crime lab results from testing of evidence from the scene led Detective Steele to believe that Felix Guillory was involved in Shane's murder. Although Detective Steele acknowledged that it was possible that more than one person was involved in Shane's murder, Detective Steele testified he had no reliable evidence in this case that put anyone at the murder scene other than Felix Guillory and Shane Cooper.

Detective Steele acknowledged that initially the suspect was Quincy Solomon, but he was later eliminated as a suspect when law enforcement confirmed what Quincy had told them. Detective Steele testified that when Guillory came in to

7

give a statement on March 25, "there [were] a lot of inconsistencies with the statement [and] [t]hat kind of pointed [law enforcement] towards his direction." Two knives were recovered in the case—one from Quincy Solomon that did not have blood on it, and one that was recovered from the vehicle that had blood on it. Detective Steele testified that only the knife at the scene was sent for analysis because there was nothing to lead him to believe that Quincy's knife had been used in the murder with the amount of blood found at the scene, and it was safe to assume that the knife from the vehicle with blood on it could provide valuable evidence.

Testimony of John William Ralston

John Ralston, a forensic pathologist, testified he performed the autopsy on Shane. Ralston testified that the cause of Shane's death was "multiple stab and incised wounds[,]" his death was a homicide inflicted by another person, and he suffered at least twenty-eight stab wounds from a single-edged knife or a sharp instrument. Ralston described at trial the cut or stab wounds to Shane's head, face, chest, arms, back, hand, and neck. Ralston acknowledged that it was possible that the wounds could have been caused by multiple sharp instruments or knives, and he could not say for certain that only one knife was used. According to Ralston,

> [m]ultiple stab wounds overtime even if they don't hit anything vital can cause a person to have blood loss and shock, but the most terminal injuries in this case were the wounds to the neck, which severed the carotid artery on one side and the jugulars on both sides.

8

Ralston also noted that Shane had an oval bite mark on his left upper back. Ralston testified that as part of the autopsy a toxicology test was performed on Shane, and the testing came back positive for methamphetamine and amphetamine, which is a metabolite or a breakdown product of methamphetamine.

Testimony of Detective Jason Laughlin

Detective Jason Laughlin with the City of Orange Police Department testified that he assisted with the investigation and interviewed witnesses. Detective Laughlin testified he spoke with Romon Jones, Quincy Solomon, and Felix Guillory. According to Detective Laughlin, on March 25, 2016, he and Detective Hilyar located Felix Guillory at his home and asked if he would come to the police station and talk with the detectives. Felix Guillory agreed to ride with the detectives to the police station where he was interviewed. According to Detective Laughlin, Felix was not in custody, and he was there voluntarily. The recorded interview was admitted into evidence and published to the jury.

Detective Laughlin testified that he instantly noticed when he encountered Felix Guillory that he had an abrasion on his nose and upper eye. Detective Laughlin testified that the injuries were to the right side of Felix's face and that his right eye appeared swollen. Felix also had a cut finger and when Felix removed his shirt, Detective Laughlin observed on the right side of Felix's body a puncture wound on his chest and a "claw scrape mark" underneath his chest. According to Detective

9

Laughlin, the fact that Felix's injuries were on the right side of his body was significant because Detective Laughlin had discovered that Shane was left-handed. Photographs Detective Laughlin took of Felix's injuries were admitted into evidence.

Detective Laughlin testified that to appease Felix while they waited for Chief Investigator Breshears to join them for the interview, he gave Felix a cold bottle of water. According to Detective Laughlin, Felix drank the water and no one else touched the bottle until Detective Hilyar seized the bottle as evidence, as instructed by Laughlin, to obtain possible DNA.

Detective Laughlin testified that law enforcement recovered Shane's phone and that Quincy had taken it and sold it to someone else. According to Detective Laughlin, Quincy appeared "[h]ighly intoxicated" when he came in to speak to Laughlin. Quincy's version of what happened that night was similar to what Felix had stated during the interview. Detective Laughlin testified that there was a small window of time in which Shane was killed, Laughlin checked the whereabouts of Quincy on the night of the murder through other witnesses, and Laughlin did not think Quincy was present when Shane was killed. Detective Laughlin testified he also spoke briefly to Romon Jones and did not find his testimony to be credible.

<u>Video Recording of Interview of Felix Guillory</u>

The video recording of the interview of Felix Guillory was admitted into evidence and played for the jury. In the interview, Felix admitted being with Shane on the evening Shane was killed. Felix stated that Shane was like a brother, and that Shane dropped him off at home late that night, Felix went to sleep, and that was the last time he spoke to or saw Shane. Felix stated that Quincy had taken Shane's phone. He denied having an altercation with Shane or knowing what happened to Shane that night. He stated he did not have a recent fight but only that he had "boxed with someone" the day before but would not name who he boxed with. At law enforcement's request, Felix gave the interviewing officers his shoes and they took photographs of his injuries. During the interview, Felix drank from a water bottle given to him by law enforcement.

<u>Testimony of Deanna Cooper</u>

Deanna Cooper, Shane's wife of about eight years, testified that on March 24, 2016, she and Shane were living with friends after their house flooded. Deanna explained that at the time neither she nor Shane were working, and Shane would do odd jobs and buy and sell things to make money. According to Deanna, on the night before Shane's murder, Shane was helping friends move and stopped by where he and Deanna were living around 11:45 p.m. before leaving again to continue to help

11

his friends move. Deanna testified that Shane was driving his Chevy Blazer that night, and she never heard from him again after he stopped by the house.

Deanna testified that she tried to call Shane's cell phone all night and when she tried to call him about 3 a.m., the call went to voicemail, so she hung up. At some point, someone called her from Shane's number and Deanna answered. Deanna testified that the caller asked for Shane, and she responded, "This is his phone." She testified that she "kind of[]" recognized the caller's voice as Quincy Solomon but Shane did not hang out with him much and she had only been around Quincy a couple of times. She testified that she knew something was wrong when detectives showed up at the house where she was staying and came in and got her.

Deanna testified that she did not know Felix Guillory and had only seen him one time for a couple of minutes. To her knowledge, Shane and Felix never hung out together and were not friends. According to Deanna, two of Shane's good friends were Albert Solomon, whom she believed was Quincy's cousin, and Lawrence Brooks. Deanna testified that Lawrence got along well with her and Shane, and he sometimes brought them food, even if Shane was not there. Deanna testified that Shane used his phone to run his business and would not have sold it.

Deanna testified that Shane was wearing a ring he wore as his wedding ring the last time she saw him and when showed the ring collected from the scene, she identified it as the ring Shane was wearing the night of the murder. When she last

12

saw him, he did not have any bite marks, cuts, or stab wounds on his body. Deanna testified that Shane was left-handed.

Deanna acknowledged that about a year before Shane died, he started using methamphetamines and selling drugs. She knew Shane was out selling drugs and knew who he was associating with, but she did not go with him and "didn't put [herself] in that position." She informed law enforcement that someone called "Po Daddy" had "a beef" with or vendetta against Shane about drugs. She testified that she had met James Guillory a couple of times and that Shane sold drugs to James Guillory and knew him well.

According to Deanna, when the detectives came to the house where she was living on the night of the murder, they asked to speak to the man she and Shane were living with, Deanna went inside to get him, but law enforcement ultimately had to use a sledgehammer to get into the house. She was taken to the police station with the man and woman they were living with. Deanna testified she provided two written statements to law enforcement. She agreed that in one of the statements she stated that Quincy called from Shane's phone about 5 a.m.

Testimony of James Lewis Guillory

James Lewis Guillory testified that Shane was a good friend and "one of the best people [he] kn[e]w." James testified he also knew Felix Guillory well and they were "business associates on a lot of levels[]" and that he and Felix had had prior

13

"run ins" with each other that "didn't turn out too good" for James. According to James, on the night Shane died he saw Shane about 1:15 or 1:30 a.m. with Felix. James testified that Felix was beating on his front door and on the side of James's house to wake him up while Shane was in the driveway in his Blazer, but James was hesitant to open the door because a couple of weeks before Felix and some people "roughed [him] up" to collect a debt. Once Felix assured James that he was not going to harm him, James opened the door and went out to talk to Shane, and Felix and Shane stayed twenty or thirty minutes. According to James, Felix seemed calm, but Shane seemed "real nervous, scared almost" and Shane asked James several times if he would ride with them because he needed his help with something. James testified that he did not go, and Felix and Shane left about 1:45 or 2:00 a.m.

James testified that about ten minutes later Quincy Solomon, who James said was like a brother to him, came by on his bicycle to "hang out and chill." James testified that Quincy had stolen Shane's phone and wanted James to sell it for him. According to James, he knew Shane was looking for his phone, so he gave Quincy money for it and told him that he was going to give it back to Shane the next day. James testified that they "g[ot] high" and that he got the phone for a little while, but Quincy stole it back and left about 6 a.m. James admitted he had prior convictions for forgery and burglary of a building.

14

<u>Testimony of Lawrence Brooks</u>

Lawrence Brooks testified that he and Shane had been friends for about fifteen years, they would see each other about every other day, and they would do jobs together to support their families. According to Brooks, on the night of Shane's murder Shane came to Brooks's house around 10 p.m. and was acting normal. Brooks testified that Shane wanted to buy a stereo for his vehicle from Brooks for $60 but only had $20. Shane gave Brooks $20 and told him he would leave and get him $40 and be back in forty-five minutes or an hour. When he did not come back, Brooks called Shane's cell phone twice and Shane said he was coming. When he still did not show up, Brooks called Shane's cell phone again, but Quincy Solomon answered and said he had Shane's phone because he owed him some money. According to Brooks, this raised a red flag because Shane would not have sold or traded his phone for money because he needed it to contact people.

Brooks testified that he and his fiancé went to look for Shane at the house where he had been living, and around 1 a.m. they saw his Blazer coming towards them at 8th and Cordrey in front of North school. Brooks stopped at the stop sign, and Shane pulled up alongside Brooks. Shane was driving with Felix in the passenger's seat, and Shane told Brooks that he did not have his phone. Brooks testified that he had known Felix for years and he had seen Felix and Shane together. Brooks asked Shane why he was with Felix, Shane said he was dropping Felix off

15

around the corner and then coming to Brooks's house, and Shane handed Brooks $20 and said he would bring him $20 more later. According to Brooks, it worried him at the time to see Shane with Felix "[b]ecause it's just a whole bunch of riffraff was going around about Shane was a snitch and they was out to get him . . . not specifically Feli[x] was going have to get him but [] he was just worried at that time that he was going to be gotten[.]" Brooks volunteered to give Felix a ride or to follow Shane to drop Felix off, but Shane told Brooks to go ahead and go home. The next morning and after Shane did not show up, Brooks and his fiancé went to the house where Shane and his wife were staying but no one was home. At a nearby store, they saw the vehicle of the person with whom Shane had been living parked, and Brooks went in and learned that Shane had been killed the night before. Brooks testified he had a conviction for burglary and a conviction for misdemeanor theft.

Testimony of Evelyn Mayorga

Mayorga testified that she was friends with Shane and best friends with Felix. According to Mayorga, she saw Felix at her residence a little after daylight on the morning of March 24, 2016. Mayorga testified that Felix appeared "dishevel[]ed" that morning, looked like he had been fighting, and had blood on his shirt and shoes. Mayorga testified that there was enough blood on the shirt that it was unsalvageable and that it did not look like the blood came from Felix. She testified that when he took off his shirt, she noticed a fresh scratch and his right eye looked a little swollen.

16

When she asked about his face, he told her he had been moving his bedroom furniture and his bedpost fell on him. She told him she did not believe him and asked him what happened. Mayorga testified that he later changed his story and said that he "was sparring with Po." Mayorga testified that did not seem right to her and that while Felix stayed with her until the next day, he was "very quiet[,]" which was not normal for Felix. Mayorga testified she last saw Shane two or three days before he died. Mayorga admitted she had more than four felony convictions for possession of a controlled substance.

Testimony of Virgie Melancon

Virgie Melancon testified she had known Felix for a long time, and she saw him around 2 a.m. on the morning of March 24, 2016. According to Melancon, her dog barked and woke her up, and she saw Felix walking fast across her property and headed toward North school. She testified that Felix always walked through her property, and she had told him not to because her kids would get scared. She testified that she did not know that Shane Cooper had been murdered on North Street. According to Melancon, an officer knocked on her door because he had been told she saw someone walk through her yard, and she gave a statement to the officer. Melancon said regardless of what the statement said, she told the officer she saw Felix around 2 a.m., not 6 a.m. that morning.

Testimony of Stephen Ward

Detective Stephen Ward with the City of Orange Police Department testified that on June 15, 2017, he attempted to serve a search warrant on Felix Guillory for a controlled buccal swab for DNA. According to Detective Ward, while attempting to serve the warrant, Felix "didn't want anything to do with us[]" and "was very agitated with us." Detective Ward testified that Felix was extremely upset and told Ward that they already had his DNA, and it took Ward quite a bit of effort to get the buccal swab. Detective Ward sealed the buccal swab in a box and put the box in a bag to bring to the police department for later transport to the crime lab.

Testimony of Memling Altamirano

Memling Altamirano, a forensic scientist at the Jefferson County Regional Crime Lab, testified that on March 24, 2016, her agency received a call around 4:30 a.m. for help from the City of Orange Police Department in processing a vehicle. Altamirano went to their police station to perform forensic analysis on the vehicle. Altamirano testified that a pocketknife was recovered from the front center console floorboard. Altamirano put the knife in a sealed container and then a detective took it for DNA testing.

Testimony of Amanda Balasko

Amanda Balasko, a forensic scientist with the DPS crime lab in Houston, testified that two stains were obtained from the ring recovered from the scene, and

18

it tested positive for blood, and she prepared those stains for DNA analysis. Three stains were obtained from the pocketknife recovered from the vehicle, which also tested positive for blood and Balasko prepared those stains for DNA analysis. The tip of a screwdriver collected from the scene tested negative for blood. The swabs of the bite marks from Shane Cooper tested positive for blood, and Balasko prepared the swabs for DNA analysis. Balasko testified that she swabbed the mouth of the water bottle that the police collected from Guillory, and she submitted the water bottle and the buccal swab taken from Guillory's mouth for DNA analysis. Balasko testified that due to the number of cases received daily for scientific analysis, the crime lab has limits on the number of items than can be submitted for testing, based on the type of offense and the situation.

Testimony of Jessica Ehmann

Jessica Ehmann, a forensic scientist in the DNA section of the DPS crime lab in Houston, testified that the DNA profile she obtained from the pocketknife blade was a mixture of two individuals. Ehmann testified as follows regarding her comparison of the DNA extracted from the pocketknife blade obtained from the vehicle and the DNA extracted from the swab taken from the water bottle from which Guillory drank:

> Assuming Felix Guillory is the source of the water bottle swab, obtaining this mixture profile is 19.1 sextillion times more likely if the DNA came from Felix Guillory and one unknown individual than if the DNA came from two unrelated, unknown individuals.

19

Based on the likelihood ratio results, Shane Cooper and Felix Guillory cannot be excluded as possible contributors to the profile.

Ehmann explained that a sextillion is "a 1 followed by 21 zeros[]" and that it is 19.1 sextillion times more likely for her to get the profile she got from the swab from the stain on the pocketknife blade if the individual that contributed to the profile from the water bottle was a part of that mixture on the pocketknife blade than not. Ehmann testified that when she compared the DNA profile from the same swab of the stain on the pocketknife blade with the DNA profile from Guillory's buccal swab (as an alternate known sample to the swab from the water bottle), the sample numbers did not change.

According to Ehmann, obtaining the DNA mixture of two individuals from the swab of the stain on the pocketknife handle

> was 455 quadrillion times more likely if the DNA came from Shane Cooper and one unknown individual than if the DNA came from two unrelated, unknown individuals.
> Obtaining this mixture profile is 130 billion times more likely if the DNA came from Felix Guillory and one unknown individual than if the DNA came from two unrelated, unknown individuals.
> Based on the likelihood ratio results, Shane Cooper and Felix Guillory cannot be excluded as possible contributors to the profile.

Ehmann testified that comparable results occurred when she tested the swab of the stain on the handle of the pocketknife in comparison with the alternate known sample for Felix Guillory.

20

Ehmann also testified about the DNA analysis results of the swab of the outside of Shane Cooper's ring with both the swab from the water bottle from which Felix Guillory drank and his buccal swab:

> The DNA profile from [Shane's ring] is interpreted as a mixture of two individuals, with Shane Cooper as an assumed contributor. Assuming Felix Guillory is the source of the water bottle swab, obtaining this mixture profile is 87.6 sextillion times more likely if the DNA came from Shane Cooper and Felix Guillory than if the DNA came from Shane Cooper and one unrelated, unknown individual.
>
> Based on the likelihood ratio result, Shane Cooper and Felix Guillory cannot be excluded as possible contributors to the profile.
>
> . . . .
>
> Obtaining this mixture profile [for the swab of Shane's ring compared to Felix Guillory's buccal swab] is 92.2 sextillion times more likely if the DNA came from Shane Cooper and Felix Guillory than if the DNA came from Shane Cooper and one unrelated, unknown individual.
>
> Based on the likelihood ratio result, Felix Guillory cannot be excluded as a possible contributor to the profile.
>
> . . . .
>
> . . . So, it's very comparable numbers. I know 5 sextillion sounds like a really big difference but, it's -- we're still talking in the tens of sextillions range. So, it's relatively a small difference in the statistics that were generated from the two different comparisons.

Ehmann agreed that she had the blood card from Shane's autopsy, and when she tested the ring, she double-checked the profile itself to make sure that the profile matched the blood card.

21

According to Ehmann, she also compared the DNA profiles found on the pocketknife blade, pocketknife handle, and Shane's ring each to a known DNA sample from Quincy Solomon, and Quincy Solomon was excluded as a contributor to each of those profiles.

The defense did not offer any witnesses or admit any evidence at trial.

## Sufficiency of the Evidence

In one issue, Appellant challenges the legal sufficiency of the evidence supporting the conviction. According to Appellant, "[n]o rational finder of fact could have found that it was Appellant's intentional or knowing actions that proximately caused the death of Shane Cooper." Appellant argues that there is insufficient evidence to support the jury's findings that Appellant caused Shane's death and that there is insufficient evidence that Appellant acted with the requisite mens rea. Appellant contends that even if the DNA evidence is believed, it "simply proves Appellant was present with [Shane] and nothing more."

In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We give deference to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable

22

inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the factfinder resolved such facts in favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). While a jury is permitted to draw reasonable inferences from the evidence, it is not permitted to draw conclusions based on speculation or factually unsupported inferences or presumptions. *See Hooper*, 214 S.W.3d at 15. The jury as factfinder is the sole judge of the weight of the evidence and credibility of the witnesses, and it may believe all, some, or none of the testimony presented by the parties. *See Metcalf v. State*, 597 S.W.3d 847, 865 (Tex. Crim. App. 2020) (citing *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018); *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995)). The appellate court does not reweigh the evidence or determine the credibility of the evidence, nor does it substitute its own judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

We "'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 16-17). "Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and

23

circumstantial evidence alone can be sufficient to establish guilt.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). Each fact need not point directly and independently to the guilt of the defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013); *Hooper*, 214 S.W.3d at 13; *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993).

A person commits murder if he "intentionally or knowingly causes the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b)(1). "Murder is a 'result of conduct' offense, which means that the culpable mental state relates to the result of the conduct, i.e., the causing of the death." *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003). A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. Tex. Penal Code Ann. § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

"Intent and knowledge are fact questions for the jury[] and are almost always proven through evidence of the circumstances surrounding the crime." *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring); *see also Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003). The jury may infer intent from any facts that tend to prove its existence, including the acts, words,

24

and conduct of the defendant. *Manrique*, 994 S.W.2d at 649. Intent to kill may also be inferred from the nature and extent of the injuries inflicted on the victim, the method of committing the crime, the size and strength of the parties, and the defendant's flight from the scene. *See id.* (noting that intent may be inferred from "the method of committing the crime and from the nature of [the] wounds inflicted on the victim[]"); *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995) (concluding that intent may be "inferred from the extent of the injuries and the relative size and strength of the parties[]"); *Wilkerson v. State*, 881 S.W.2d 321, 324 (Tex. Crim. App. 1994) (considering the nature of the injury inflicted and the defendant's flight from the scene, among other facts, in concluding that the evidence was sufficient to support the jury's finding of intent to kill); *Felder v. State*, 848 S.W.2d 85, 90 (Tex. Crim. App. 1992) (considering the number and location of the stab wounds inflicted on the victim in examining the sufficiency of the evidence to support intent to kill finding). A jury may also infer knowledge from such evidence. *Manrique*, 994 S.W.2d at 649.

On the record before us, we conclude that the jury could have made reasonable inferences from the evidence and found that the evidence showed beyond a reasonable doubt that Felix Guillory was guilty of murder as charged. The jury heard testimony from law enforcement regarding Shane's injuries observed at the scene, and the jury saw photographs of Shane's injuries at the scene. The jury heard

25

Ralston, the forensic pathologist that performed Shane's autopsy, testify the cause of Shane's death was "multiple stab and incised wounds[,]" his death was a homicide inflicted by another person, he suffered at least twenty-eight stab wounds from a single-edged knife or a sharp instrument, and he had cut or stab wounds to his head, face, chest, arms, back, hand, and neck.

The jury also heard James Guillory's and Lawrence Brooks's testimony that they each saw Shane and Felix together shortly before Shane was found murdered and Brooks's testimony that it worried him to see Shane and Felix together. The jury heard Detective Steele's testimony that the interviews conducted, including Felix's inconsistent interview, and the DPS crime lab results from the evidence at the scene led him to believe Felix was involved in Shane's murder. The jury heard Detective Steele's testimony that, based on the evidence at the scene, he believed Shane and Felix began arguing in the vehicle, continued fighting in the vehicle, and that Shane got out of the vehicle and tried to defend himself before he was murdered by Felix. The jury heard evidence that Shane was left-handed. The jury saw photographs taken during Felix's interview the day after the murder of Felix's injuries to the right side of his body. The jury heard testimony that Felix was agitated when a search warrant was executed to obtain his buccal swab. The jury heard Melancon testify that she saw Felix walking fast across her property, which was in the vicinity of the murder, about 2:00 a.m. that night. The jury heard Ehmann's testimony regarding the DNA

26

profiles on the pocketknife blade, pocketknife handle, and Shane's ring from the scene and that the samples showed a mixture of DNA from Shane and Felix Guillory, and that Felix Guillory could not be excluded as a DNA contributor to blood stains on those pieces of evidence.

The jury also watched Felix's recorded interview at the police department where he admitted that he had been with Shane that evening, but he denied having an altercation with Shane or being involved in the murder, but Felix could not provide an explanation for apparent wounds to his body, and Felix stated in his interview that Shane took him home that night and he had stayed home after that. The jury heard Mayorga, who said she was Felix's best friend, testify that Felix showed up to her house a little after daylight on the morning of March 24, 2016, and that he appeared "dishevel[]ed" that morning and like he had been in a fight. The jury heard her testify that Felix had wounds on the right side of his face and had blood on his shirt and shoes. The jury heard Mayorga testify that Felix was acting unusual and that she did not believe his initial story that his injuries were from a bedpost falling on him or his later story that the injuries occurred because he had been "sparring with Po."

After reviewing all the evidence and viewing the evidence in the light most favorable to the verdict, we conclude that a rational factfinder could have found the essential elements beyond a reasonable doubt necessary to conclude that Appellant

27

committed the offense of murder. *See* Tex. Penal Code Ann. § 19.02(b)(1); *Jackson*, 443 U.S. at 319; *Hooper*, 214 S.W.3d at 13; *see also Brooks*, 323 S.W.3d at 899 n.13; *Clayton*, 235 S.W.3d at 778. We overrule Appellant's issue and affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on June 25, 2021
Opinion Delivered August 11, 2021
Do Not Publish

Before Golemon, C.J., Horton and Johnson, JJ.

28